581 So.2d 772 (1990)
Cynthia A. POWELL and Bruce Powell
v.
BLUE CROSS AND BLUE SHIELD OF ALABAMA.
88-1342.
Supreme Court of Alabama.
December 28, 1990.
*773 John W. Haley of Hare, Wynn, Newell & Newton, Birmingham, for appellants.
Duncan B. Blair of Lange, Simpson, Robinson & Somerville, and Walter F. Scott III, Birmingham, for appellee.
PER CURIAM.
This appeal presents this primary issue: May the insurer/indemnitor, by contract providing for subrogation, claim reimbursement of its payment to the insured/indemnitee, out of the insured/indemnitee's recovery from the third-party tort-feasor, when the third-party recovery does not exceed the insured/indemnitee's total loss? The trial court held that the insurer/indemnitor could so contract and ordered the insured/indemnitee to reimburse the insurer/indemnitor. Because we hold that the right of subrogation, whether equitable or contractual, does not arise until the plaintiff/insured has been fully compensated for her loss, we reverse and remand.[1]
The facts in this case were stipulated by the parties. Cynthia Powell was permanently injured in an automobile accident. Blue Cross and Blue Shield of Alabama ("Blue Cross") paid Cynthia's medical expenses of $27,080.26 under the provisions of a group health insurance policy that covered Cynthia. Cynthia sued the driver of the other automobile involved in the accident, Joy Jolly, and its owner, Dale Jolly, alleging negligence and wantonness. In an amended complaint, she alleged over $7,000,000 as damages for her injuries. Cynthia Powell, however, settled her claim against the Jollys for the $100,000 limit of the Jollys' liability insurance policy.
Blue Cross filed a motion to intervene in the lawsuit, seeking subrogation for $27,080.26 that it had paid for Cynthia's medical expenses. The trial court allowed Blue Cross to intervene, dismissed the Jollys, and ruled that Blue Cross was entitled to the full amount it had paid for Cynthia's medical expenses out of the settlement recovery. In its judgment the trial court stated that "it is conceded by all concerned that the $100,000 recovery does not make the plaintiff whole." The trial court went on, however, to hold that under the insurance contract Blue Cross was "entitled to the reimbursement of any amounts paid by it for the benefit of its insured. This reimbursement is due even though the insured is not paid in full, or made whole by any recovery from a third party."
The Powells appeal the trial court's judgment that Blue Cross is entitled to recover the full $27,080.26. For a complete understanding of the issues involved in this case and our resolution of them, the reader should take note of two other cases released this day: McKleroy v. Wilson, 581 So.2d 796 (Ala.1990); and Sharpley v. Sonoco *774 Products Co., 581 So.2d 792 (Ala. 1990).
Contained in the Blue Cross policy was specific language that gave Blue Cross first priority over any money that the insured collected from a third party.[2]
"Separate from and in addition to the Administrator's right of subrogation, if a subscriber or a member of his family recovers money from the other person or organization for any injury or condition for which benefits are provided by the administrator, the Member agrees to reimburse the Administrator from the recovered money that amount of benefits the Administrator has paid or provided. That means that the Member will pay the Administrator the amount of money recovered by him through judgment or settlement from the third person or organization up to the amount of the benefits paid or provided by the administrator. The right to reimbursement of the Administrator comes first even if a Member is not paid for all of his claim for damages against the other person or organization or if the payment he receives is for, or is described as for, his damages (such as for personal injuries) for other health care expenses or if the member recovering the money is a minor."[3] (Emphasis added.)
Blue Cross filed with this Court a motion to dismiss the appeal, arguing that the plaintiffs have no standing to bring an appeal because the trial court dismissed the Jollys as defendants. A party or his personal representative has standing to bring an appeal from an adverse ruling contained in a final judgment. Home Indem. Co. v. Anders, 459 So.2d 836, 842 (1984), appeal after remand, 477 So.2d 312 (Ala.1985). The Powells suffered an adverse ruling with respect to the issue of subrogation. This judgment with respect to Blue Cross is final in all respects and is therefore a final judgment from which the Powells may appeal. Rule 4(f), A.R.Civ.P.
The entire law of subrogation, conventional or legal, is based upon equitable principles. International Underwriters/Brokers, Inc. v. Liao, 548 So.2d 163, 165 (Ala. 1989). The equitable considerations that are the underpinnings of subrogation are (1) that the insured should not recover twice for a single injury, and (2) that the insurer should be reimbursed for payments it made that, in fairness, should be borne by the wrongdoer. Id. In International Underwriters, we stated;
"[N]o right of subrogation against the insured exists upon the part of the insurer where the insured's actual loss exceeds the amount recovered from both the insurer and the wrongdoer, after deducting costs and expenses. In other words, the insurer has no right as against the insured where the compensation received by the insured is less than the loss."
548 So.2d at 164-65.
Although today subrogation is most often utilized by insurance companies, historically it was available to anyone who was obligated to pay the debts of another.[4] Deneberg, Subrogation Recovery: Who is *775 Made Whole?, 29 Fed'n Ins.Couns.Q. 185, 186 (1979). Anyone who was obligated to pay the debts of another could utilize subrogation. Id. The English courts originally applied subrogation to insurance policies on the rationale that the contract of insurance was a contract of indemnity, which meant that the insured should be fully indemnified, but not more than fully indemnified. Id. citing Castallain v. Preston, 11 Q.B.D. 380, 386 (1883).
The principle of indemnity was the primary reason for the adoption of subrogation in insurance cases. See International Underwriters, supra; North River Ins. Co. v. McKenzie, 261 Ala. 353, 359, 74 So.2d 599, 604 (1954). The insurer's obligation was to make the insured whole, but not more than whole. Accordingly, subrogation originally served to prevent the insured from receiving a double recovery by first collecting the insurance proceeds and then suing the tort-feasor or other third parties, so as to recover again for his injury.[5] A second reason for the adoption of subrogation in insurance cases is what has been called "the moralistic basis of tort law as it has developed in our system." Kimball & Davis, The Extension of Insurance Subrogation, 60 Mich.L.Rev. 841, 841 (1962). In other words, the wrongdoer should bear the burden of reimbursing the insurer for payments it made to the insured because of the wrongdoer's actions. See International Underwriters, supra; City of Birmingham v. Walker, 267 Ala. 150, 158, 101 So.2d 250, 256 (1958).
Subrogation accomplished these goals by allowing the insurer to "stand in the shoes" of the insured in order to recover its payments from the tort-feasor who caused the damage. Therefore, these early subrogation cases were based on the premise that the insured would be fully indemnified for his loss before the insurer would have a right to subrogation. Deneberg, supra, at 187.
This basic principle of fully indemnifying the insured was also followed in Alabama:
"It is true that subrogation `does not depend upon contract, but has its foundation in natural justice' when the debt or superior lien has been fully paid. That is, elements of subrogation are that it is a valuable right that touches the one who owns it and invokes the application or seeks the substitution in that ownership, and that the claim against the debtor or superior lien holder has not been waived when the debt or superior lien has been fully paid by him who would substitute."
Montgomery v. Wadsworth, 226 Ala. 667, 669, 148 So. 419, 421 (1933) (citations omitted).
In the present case, the contract of insurance would abrogate these underlying principles of subrogation by reimbursing the insurer even though the insured has not fully recovered for her loss. Blue Cross argues that it should be allowed to recover the money it has paid in medical expenses, even though Cynthia's loss exceeds her recovery, because its policy expressly entitles it to recover that money out of the settlement proceeds. Blue Cross bases its argument upon language contained in the International Underwriters opinion.
Although the policy itself was not in evidence in International Underwriters, we stated in dictum that "equitable principles apply to all instances of subrogation except when the contract provides otherwise." International Underwriters, 548 So.2d at 165. However, to construe this language as Blue Cross would have us to do would undermine the equitable principles upon which subrogation is based and *776 would thwart the purpose for which the insured purchased insurance. Equity requires that the insured should at least recover his or her loss before the insurer is subrogated.
In International Underwriters, we cited several cases from other jurisdictions in support of the proposition that "equitable principles apply to all instances of subrogation except when the contract provides otherwise." 548 So.2d at 165. Those cases, however, represent a split of authority as to whether the insurer's right to subrogation arises before the insured is fully reimbursed for his loss. For example, in Westendorf v. Stasson, 330 N.W.2d 699 (Minn. 1983), the Supreme Court of Minnesota expressly stated that "when the right to subrogation arises by virtue of an agreement, the terms of the subrogation will nonetheless be governed by equitable principles, unless the agreement clearly and explicitly provides to the contrary.... The right [to subrogation] may be modified or extinguished by contract." Id. at 703. (Emphasis added.) The Minnesota court recognized that the right to subrogation itself exists before the insured has fully recovered for his loss and that the insurer may, through the contract, completely negate the equitable principles upon which that right is based.[6]
However, in International Underwriters, we also cited Garrity v. Rural Mut. Ins. Co., 77 Wis.2d 537, 253 N.W.2d 512 (1977). In Garrity the Wisconsin Supreme Court held that a standard subrogation clause in a fire insurance policy did not change the common law rule that required that the insured fully recover his loss before the insurer had a right of subrogation. The Garrity court stated, "We hold that because the contract here contains no language to the contrary, the normal rule of subrogation applies and the subrogee has no right to share in the fund recovered from the tort-feasor until the subrogor is made whole." Garrity, 77 Wis.2d at 546-47, 253 N.W.2d at 516.
The Wisconsin court later explained its Garrity holding in Rimes v. State Farm Mut. Auto. Ins. Co., 106 Wis.2d 263, 316 N.W.2d 348 (1982). In Rimes the insurer was seeking subrogation for medical payments that it had made to its insured, out of settlement proceeds recovered from the tort-feasor. The trial court had determined that the Rimeses sustained damages of $300,433.54 and that the settlement with the tort-feasors was $125,000. 106 Wis.2d at 264-66, 316 N.W.2d at 350. The Wisconsin Supreme Court stated that "[t]he subrogation agreement in the instant case between Rimes and State Farm is not significantly dissimilar [from the one in Garrity] and if literally interpreted would permit recovery by State Farm in the amount of medical payments made on behalf of Rimes." 106 Wis.2d at 270, 316 N.W.2d at 352-53 (emphasis added).
The court in Rimes, however, did not allow the literal interpretation of the subrogation agreement to abrogate the equitable basis for subrogation. The Wisconsin court noted that "one who claims subrogation rights, whether under the aegis of either legal or conventional subrogation, is barred from any recovery unless the insured is made whole." 106 Wis.2d at 272, 316 N.W.2d at 353. Moreover, the court indicated that this rule would apply even though contract provisions specified a different result. Rimes followed this rationale:
"[E]ven though an insured has recovered from a tort-feasor a sum more than sufficient to equal the subrogated amount claimed by the insurer, the insurer is not entitled to subrogation unless the insured has been made whole for his loss. The purpose of subrogation is to prevent a double recovery by the insured. Under circumstances where an insured has received full damages from the tort-feasor and has also been paid for a portion of those damages by the insurer, he receives double paymenthe has been *777 made more than whole. Only under those circumstances is the insurer, under principles of equity, entitled to subrogation. Subrogation is to be allowed only when the insured is compensated in full by recovery from the tort-feasor."
106 Wis.2d at 271-72, 316 N.W.2d at 353.
Consequently, the court in Rimes ruled that an insurer has no right to subrogation until the insured is first fully compensated for his loss. In International Underwriters, we did not decide the issue before us now, because the insurance contract was not part of the record in that case. As a result, the language and analysis in International Underwriters did not consider such a policy provision. International Underwriters, supra, at 166. The present case, however, presents us with a policy written specifically to abrogate the equitable principles of subrogation. We recognize that some jurisdictions hold that although subrogation is based on equitable principles the insurance contract may specifically defeat those considerations by allowing the insurer to be subrogated even though the insured has not been fully compensated for his loss. See, e.g., Culver v. Insurance Co. of North America, 115 N.J. 451, 559 A.2d 400 (1989); Peterson v. Ohio Farmers Ins. Co., 175 Ohio St. 34, 191 N.E.2d 157 (1963).
We are of the opinion, however, that the better reasoned rule is that the insurer is not entitled to subrogation unless and until the insured has been made whole for his loss. We so hold. See, e.g., St. Paul Fire & Marine Ins. Co. v. W.P. Rose Supply Co., 19 N.C.App. 302, 198 S.E.2d 482 (1973); Lombardi v. Merchants Mut. Ins. Co., 429 A.2d 1290 (R.I.1981); Wimberly v. American Casualty Co. of Reading, Penn., 584 S.W.2d 200 (Tenn.1979); Ortiz v. Great So. Fire & Cas. Ins. Co., 597 S.W.2d 342 (Tex. 1980); Thiringer v. American Motors Ins. Co., 91 Wash.2d 215, 588 P.2d 191 (1978); Rimes v. State Farm Mut. Auto. Ins. Co., supra; see, also, Allstate Ins. Co. v. Clarke, 364 Pa.Super. 196, 527 A.2d 1021 (1987); Deneberg, supra, at 190.
This rule better reflects the underlying equitable principles that give rise to the remedy of subrogation itself, without which there would be no right of subrogation at all, and better reflects the purpose for which one purchases insurance. The very heart of the bargain when the insured purchases insurance is that if there is a loss he or she will be made whole. The cases that originally applied subrogation to insurance contracts did so on behalf of the insurer only after the insured had been fully compensated. These cases never envisioned the use of subrogation as a device to fully reimburse the insurer at the expense of leaving the insured less than fully compensated for his loss. "Where either the insurer or insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume." Rimes, 106 Wis.2d at 276, 316 N.W.2d at 355 (quoting Garrity v. State Farm Mut. Auto. Ins. Co., 77 Wis.2d 537, 542, 253 N.W.2d 512, 514 (1977)).
Our review of the origins and development of the law of subrogation persuades us that a prerequisite to the right of subrogation is the full compensation of the insured. In effect, an attempt to contract away this prerequisite to the right of subrogation would defeat the right itself. This is not compatible with the principle of fairness that underlies all equitable doctrines. Therefore, we hold that the insurer has no right to subrogation unless and until the insured is made whole for his loss.
For purposes of subrogation, the test for when the insured has been made whole is whether the injured plaintiff has been completely compensated for all of his loss. Likewise, all sources of reimbursement must be considered in determining the extent to which the plaintiff has been compensated. It is when the plaintiff's recovery from all sources exceeds the sum total of the plaintiff's damages that the right to subrogation arises.
Typically, in cases involving subrogation, a plaintiff injured by a third party recovers a portion of his total loss from an indemnitor or indemnitors and a portion from the tort-feasor. In such cases the indemnitor(s) may reimburse the injured plaintiff for such damages as medical expenses, *778 loss wages, or disability. The plaintiff, or the indemnitor(s), as provided in the indemnification contract, will then bring an action for damages against the tort-feasor. If the proceeds collected from the tort-feasor, either through settlement or a judgment, when added to the amount paid to the plaintiff via indemnity contract(s), equals the amount of the plaintiff's total loss, then the plaintiff is made whole.[7]
This holding requires calculation and comparison of two amounts, (1) the amount of the plaintiff's total loss and (2) the total amount that the plaintiff receives in compensation for that loss. The determination of what the plaintiff's loss is, and whether he has been made whole for that loss, is a question of fact. Calculation of the plaintiff's loss requires the finder of fact to consider all elements of that loss, including, but not limited to, damage to property, medical expenses, pain and suffering, loss of wages, and disability. Because punitive damages are not an element of compensation, they can not be included in the calculation of the plaintiff's loss. Determining whether the indemnitee is made whole should be based on the principle that the indemnitee should be made whole, but not more than whole. Likewise, calculation of the amount received in compensation requires consideration of every payment made to, or on behalf of, the plaintiff that arises out of the damages sustained in the event that gave rise to the cause of action.
Once these two amounts are obtained, subrogation, either equitable or as specified in the indemnitor's contract, will apply if the amount received in compensation by the plaintiff exceeds the plaintiff's amount of loss. As noted above, where the total compensation received is less than the loss, no right of subrogation arises. However, where the amount of compensation exceeds the amount of loss, then the indemnitor will be entitled to subrogation against the amount by which the compensation exceeds the loss.
This rule may be best explained by example. It should be noted that the numbers in Tables 1 through 3 that follow reflect amounts that have been selected to illustrate the factors that should be considered in the calculation of a plaintiff's loss and recovery. Although similar specificity in amounts might occur in joint settlement negotiations where the plaintiff/indemnitee, indemnitor(s), and tort-feasor agreed to set such amounts, these figures are not meant to reflect how a finder of fact would determine the plaintiff's loss. For instance, consider a case where a plaintiff's loss and recovery are as reflected in Table 1.

*779
 Table 1.
PLAINTIFF'S LOSS PLAINTIFF'S RECOVERY
 Amount Paid Plaintiff By
 First-Party Indemnification
Property $ 10,000 Collision Insurer $ 10,000
Medical 50,000 Medical Insurer 50,000
Lost Wages 5,000 Wage Contributor[8] 5,000
Disability 10,000 Disability Insurer 10,000
 Total Indemnified ($75,000)
 Amount Paid By Tort-feasor
 General Damages $50,000
Pain and Suffering 55,000 Punitive Damages -0-
 Tort-feasor Total ($50,000)
 TOTAL RECOVERY
TOTAL LOSS $130,000 (All Money Paid) $125,000

In Table 1, the indemnitors have no right to subrogation, because the plaintiff recovered less than the total amount necessary to make him whole. The indemnitors paid the plaintiff a total of $75,000 and the plaintiff collected $50,000 from the tort-feasor. The plaintiff's total recovery is $125,000, which is $5,000 less than his total loss. Because the plaintiff recovers less than $130,000, there is nothing to which the indemnitor could be subrogated. It is irrelevant as to how the indemnitee may allocate the amounts recovered from the tort-feasor (e.g., it is irrelevant that the complaint may seek damages only for pain and suffering or that the settlement or judgment states that the amount recovered is only for pain and suffering). The court will look to the total dollar amount recovered by the indemnitee, from whatever source, as compensation for his loss.
If, on the other hand, the plaintiff recovers more than $130,000 in compensation for his loss, then the indemnitors would have a right to subrogation in the amount of the overage. For instance, consider Table 2.

*780
 Table 2.
PLAINTIFF'S LOSS PLAINTIFF'S RECOVERY
 Amount Paid Plaintiff By
 First-Party Indemnification
Property $ 10,000 Collision Insurer $ 10,000
Medical 50,000 Medical Insurer 50,000
Lost Wages 5,000 Wage Contributor 5,000
Disability 10,000 Disability Insurer 10,000
 Total Indemnified ($75,000)
 Amount Paid By Tort-feasor
 General Damages $50,000
Pain and Suffering 55,000 Punitive Damages 150,000
 Tort-feasor Total ($200,000)
 TOTAL RECOVERY
TOTAL LOSS $130,000 (All Money Paid) $275,000

In Table 2, the plaintiff has recovered $75,000 from the indemnitors and $200,000 from the tort-feasor, for a total recovery of $275,000. Therefore, the plaintiff's total recovery is $145,000 greater than his total loss; there is an overage of $145,000.
The indemnitors, in the above example, have a right of subrogation in the amount that each has paid to, or on behalf of, the plaintiff. The total amount required to fully subrogate all indemnitors is $75,000. In this example there is enough money to fully compensate each indemnitor, and the plaintiff would be entitled to the remaining $70,000.
In some cases, however, the amount of the plaintiff's recovery subject to subrogation may not be enough to satisfy the amount that the first-party indemnitor or indemnitors paid in benefits. In those cases where there is a single indemnitor entitled to subrogation, that indemnitor would recover the full amount of the overage. However, in cases where there is more than one indemnitor with a right to subrogation, and the rights to subrogation have not been altered by contract, each indemnitor would be entitled to its pro rata share of the available proceeds. Standard Marine Ins. Co. v. Westchester Fire Ins. Co., 93 F.2d 286 (2d Cir.1937), cert. denied, 303 U.S. 661, 58 S.Ct. 830, 82 L.Ed. 1120 (1938); 16 Couch On Insurance 2d, Subrogation § 61:48 (1983).
For example, consider a third situation, where the plaintiff's losses are the same as in the first two tables, but the plaintiff recovers compensation for those losses as shown in Table 3.

*781
 Table 3.
PLAINTIFF'S LOSS PLAINTIFF'S RECOVERY
 Amount Paid Plaintiff By
 First-Party Indemnification
Property $ 10,000 Collision Insurer $ 10,000
Medical 50,000 Medical Insurer 50,000
Lost Wages 5,000 Wage Contributor 5,000
Disability 10,000 Disability Insurer 10,000
 Total Indemnified ($75,000)
 Amount Paid By Tort-feasor
 General Damages $75,000
Pain and Suffering 55,000 Punitive Damages 50,000
 Tort-feasor Total ($125,000)
 TOTAL RECOVERY
TOTAL LOSS $130,000 (All Money Paid) $200,000

In Table 3 the plaintiff's total loss was $130,000. The plaintiff's total recovery was $200,000$75,000 paid by the first-party indemnitors plus $125,000 recovered from the tort-feasor. In this example, the first-party indemnitors' right to subrogation arises because the plaintiff has recovered a total amount in excess of his total loss. In this example, however, there would be only $70,000 available for subrogation, to be divided among the four first-party indemnitors. Because the amount of the overage is insufficient to fully compensate all of the first-party indemnitors, each indemnitor would be entitled to a pro rata share of the overage, based on the ratio that the amount of its indemnification to the plaintiff bears to the total indemnification paid to the plaintiff.
In the example set out in Table 3 the collision insurer would recover $9,333.33 $10,000 (amount paid) divided by $75,000 (total loss paid by indemnitors) multiplied by $70,000 (amount available for subrogation). Similarly, the medical insurer would recover $46,666.67($50,000 ÷ $75,000) × $70,000. The wage contributor would recover $4,666.67($5,000 ÷ $75,000) × $70,000. The disability insurer would recover $9,333.33($10,000 ÷ $75,000) × $70,000.
The total amount subrogated and divided among the insurers would thus be $70,000.
It should be noted that these calculations, as exemplified in the three tables, do not include attorney fees and litigation expenses in computing the plaintiff's "total loss"; therefore, any reimbursement to the indemnitor should be further reduced by an amount equal to the indemnitor's pro rata share of the attorney fees and costs, computed, of course, only against the third-party recovery.
Although the information in Tables 1 through 3 is presented in detail that might occur only in a settlement conference where all interested parties reached agreement as to specific elements of damages, the rule governing when subrogation arises has ready application in litigation. Where a finder of fact determines plaintiff's total loss, that determination would take the place of the breakdown of figures represented in the column labeled "Plaintiff's Loss" in the tables. The calculation would then proceed as discussed previously, by comparing the plaintiff's total loss with his total recovery. In most cases a jury would determine the plaintiff's total loss as the amount rendered in its verdict. The plaintiff's total recovery would include the amount of the judgment that the plaintiff *782 actually collects from the tort-feasor, plus any other reimbursement that he receives from any other source for his injuries. For example, consider Table 4.

 Table 4.
PLAINTIFF'S LOSS PLAINTIFF'S RECOVERY
 Amount Paid Plaintiff By
 First-Party Indemnification
 Collision Insurer $ 10,000
 Medical Insurer 50,000
 Wage Contributor 5,000
 Disability Insurer 10,000
 Total Indemnified ($75,000)
 Amount Paid By Tort-feasor
 General Verdict $100,000
 Punitive Damages -0-
 Tort-feasor Total ($100,000)
TOTAL LOSS TOTAL RECOVERY
(Jury Verdict) $100,000 (All Money Paid) $175,000

In Table 4 the plaintiff recovered $75,000 from first-party indemnitors. After a trial, the jury returned a general verdict against the tort-feasor in the amount of $100,000. Therefore, the plaintiff's total loss, as determined by the finder of fact, is $100,000. Assuming that the plaintiff is able to collect the entire judgment, plaintiff's total recovery is $175,000$100,000 from the tort-feasor plus $75,000 paid by first-party indemnitors. In the example set forth in Table 4, the plaintiff has collected $75,000 more than his total loss. Consequently, the indemnitors would have a right to subrogation to the $75,000 overage.
In the present case, the record shows that Cynthia Powell's damages far exceed the amount of her recovery; thus, Blue Cross has no right to be reimbursed for its payment of medical expenses on behalf of Cynthia. Had Blue Cross's right to subrogation arisen, then the language in the policy would have controlled. It follows that Blue Cross, as of the time of the writing of this opinion, had no right to subrogation because Cynthia Powell had not yet been made whole. Accordingly, the judgment is reversed, and the cause is remanded.
REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES and ADAMS, JJ., concur.
JONES, J., concurs specially.
KENNEDY, J., concurs in the result.
MADDOX, HOUSTON and STEAGALL, JJ., dissent.
JONES, Justice (concurring specially).
I agree with the plurality opinion. I write separately, however, to expand upon the formula, and the tables used to illustrate the formula, for determining if and when the primary plaintiff (the injured party) has made full recovery. While the tables furnished in the opinion are technically correct, certain assumptions may be helpful in understanding and applying them:
First, remember that the problem here addressed arises only where the amount recovered from the third-party tort-feasor is less than the plaintiff's total damages, including the amount paid by the plaintiff's indemnitor;
*783 Second, the plaintiff's "total loss" contemplates recovery of compensatory damages only, and not punitive damages;
Third, the plaintiff's total loss, which she is entitled to recover from the tort-feasor, less the amount paid by the indemnitor, must be determined. This can be done by agreement, by a jury or nonjury trial against the tort-feasor, or on petition of any party by submitting the damages issue to a trial court;
Fourth, either the indemnitor's claim against the tort-feasor must be included as a part of the primary plaintiff's total claim, or the indemnitor must intervene as a derivative plaintiff or otherwise assert its independent claim against the tort-feasor. In any event, the primary and derivative plaintiffs should either agree (in the case of a general verdict) upon the amount of their respective potential recoveries or use the mechanism provided in Rule 49, A.R.Civ.P. ("Special Verdicts"), designating their respective separate awards;
Fifth, keep in mind, always, that it is the total of the primary plaintiff's (the injured insured's) and the derivative plaintiff's (the insurer's) awards that combine to make up the primary plaintiff's "total loss," less any award for punitive damages as illustrated in Table 2. As a further precaution, a general verdict should not be used in any case in which the primary plaintiff seeks punitive damages, because punitive damages are not considered a component of the primary plaintiff's "total loss," and do not inure to the benefit of the primary plaintiff, unless and until the derivative plaintiff has been fully reimbursed in accordance with the prescribed formula; and
Sixth, the plurality opinion correctly omits any reference to Mr. Powell's derivative claim for loss of consortium, because his claim for noneconomic loss would ripen only upon full payment to the primary plaintiff and full reimbursement to the indemnitor. The spouses' derivative claim for economic loss, however, would take priority over the insurer's derivative claim. Although there are no punitive damages involved here, it is worthy of note that, even if there were, Mr. Powell's status as a derivative plaintiff would not entitle him to recover punitive damages. Fireman's Fund Am. Ins. Co. v. Coleman, 394 So.2d 334, 341 (Ala.1980).
If I have "gilded the lily," I make no apology, for I have offered these observations in the spirit of the Scottish adage that proclaims "`Tain't simple `til I understand it."
MADDOX, Justice (dissenting).
The plurality states the primary issue in this case as: "May the insurer/indemnitor, by contract providing for subrogation, claim reimbursement of its payment to the insured/indemnitee, out of the insured/indemnitee's recovery from the third-party tort-feasor, when the third-party recovery does not exceed the insured/indemnitee's total loss?"
In a footnote, the plurality states: "Because of our holding with respect to the primary issue, and because the third-party recovery is less than the injured insured's total loss, the secondary issue, whether the insurer/indemnitor may extend or enlarge its equitable right of subrogation by contract, is moot."
Even though the opinion in this case does not specifically state, it essentially says that a hospital insurance carrier, or any indemnitor for that matter, cannot, by contract, create a right to be reimbursed out of its insured/indemnitee's recovery for damages caused by a third-party tort-feasor until its insured/indemnitee is made whole. In short, the Court today holds that any subrogation provision or other provision in a hospital insurance policy is void unless the insured has been made whole by the third-party tort-feasor.
The contract provision that the plurality construes in this case reads as follows:
"Separate from and in addition to the Administrator's right of subrogation, if a subscriber or a member of his family recovers money from the other person or organization for any injury or condition for which benefits are provided by the administrator, the Member agrees to reimburse the Administrator from the recovered *784 money that amount of benefits the Administrator has paid or provided. That means that the Member will pay the Administrator the amount of money recovered by him through judgment or settlement from the third person or organization up to the amount of the benefits paid or provided by the administrator. The right to reimbursement of the Administrator comes first even if a Member is not paid for all of his claim for damages against the other person or organization or if the payment he receives is for, or is described as for, his damages (such as for personal injuries) for other health care expenses or if the member recovering the money is a minor." (Emphasis added.)
This contract provision is much more specific than the provision contained in the insured's policy which it appears was in effect at the time of the accident.[9]
As I read the opinion by the plurality, it materially changes the law of this State. It is not enough for me simply to make such a broad charge, however, because a lot of time and effort has gone into this final product of the Court, and the issue is of paramount importance, but judicial integrity compels me to set out the specific reasons for my disagreement with so many of my brothers and my sister who entertain a different view.
I start with the constitutional right, granted by both the United States Constitution and the State Constitution, to contract. In Article I, § 10 of the United States Constitution, it is provided that "No state shall ... pass any ... law impairing the obligations of contracts...." Similarly, in Article IV, § 95, of the Alabama Constitution of 1901, it is provided that "[t]here can be no law of this state impairing the obligation of contracts by destroying or impairing the remedy for their enforcement...."
Even though it acknowledges that the specific language of the policy "gave Blue Cross first priority over any money that the insured collected from a third party," the plurality refuses to enforce this clear language of the policy. The plurality refuses *785 to enforce this contract even though this Court has specifically said that "Courts are not at liberty to rewrite policies to provide coverage not intended by the parties." Altiere v. Blue Cross & Blue Shield, 551 So.2d 290 (Ala.1989).
The plurality, in a footnote, says that, because of the holding made on the primary issue, a secondary issue "whether the insurer/indemnitor may extend or enlarge its equitable right of subrogation by contract, is moot"; nevertheless, the opinion specifically states as follows:
"The present case ... presents us with a policy written specifically to abrogate the equitable principles of subrogation. We recognize that some jurisdictions hold that although subrogation is based on equitable principles the insurance contract may specifically defeat those considerations by allowing the insurer to be subrogated even though the insured has not been fully compensated for his loss. See, e.g., Culver v. Insurance Co. of North America, 115 N.J. 451, 559 A.2d 400 (1989); Peterson v. Ohio Farmers Ins. Co., 175 Ohio 34, 191 N.E.2d 157 (1963).
"We are of the opinion, however, that the better reasoned rule is that the insurer is not entitled to subrogation unless and until the insured has been made whole for his loss. We so hold. See, e.g., St. Paul Fire & Marine Ins. Co. v. W.P. Rose Supply Co., 19 N.C.App. 302, 198 S.E.2d 482 (1973); Lombardi v. Merchants Mut. Ins. Co., 429 A.2d 1290 (R.I. 1981); Wimberly v. American Casualty Co. of Reading, Penn., 584 S.W.2d 200 (Tenn.1979); Ortiz v. Great So. Fire & Cas. Ins. Co., 597 S.W.2d 342 (Tex.1980); Thiringer v. American Motors Ins. Co., 91 Wash.2d 215, 588 P.2d 191 (1978); Rimes v. State Farm Mut. Auto. Ins. Co., [106 Wis.2d 263, 316 N.W.2d 348 (1982) ]; see, also, Allstate Ins. Co. v. Clarke, 364 Pa.Super. 196, 527 A.2d 1021 (1987); Deneberg, [Subrogation Recovery: Who is Made Whole? 29 Fed'n Ins. Couns.Q. 185 (1979)], at 190.
"This rule better reflects the underlying equitable principles that give rise to the remedy of subrogation itself, without which there would be no right of subrogation at all, and better reflects the purpose for which one purchases insurance. The very heart of the bargain when the insured purchases insurance is that if there is a loss he or she will be made whole. The cases that originally applied subrogation to insurance contracts did so on behalf of the insurer only after the insured had been fully compensated. These cases never envisioned the use of subrogation as a device to fully reimburse the insurer at the expense of leaving the insured less than fully compensated for his loss. `Where either the insurer or insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume.' Rimes, 106 Wis.2d at 276, 316 N.W.2d at 355 (quoting Garrity v. State Farm Mut. Auto. Ins. Co., 77 Wis.2d 537, 542, 253 N.W.2d 512, 514 (1977))."
581 So.2d at 777.
The effect of this holding, of course, is that an insurer cannot, even by specific provisions of the policy, provide that it will receive first priority over any money that the insured collects from a third party. I respectfully disagree with the statement in footnote 1 that the opinion in this case does not address "whether the insurer/indemnitor may extend or enlarge its equitable right of subrogation by contract." It appears to me that the above-quoted portion of the opinion does address that question, and inferentially holds that an insurer/indemnitor cannot contract to receive anything until the insured is made whole.
It has been the law of this State for many years that, in the absence of public policy considerations or statutory provisions to the contrary, insurance companies have the right to limit their liability or to insure against loss as they choose.[10]
*786 Although the plurality opinion gives an excellent history of subrogation, the same was done with equal excellence in International Underwriters/Brokers, Inc. v. Liao, 548 So.2d 163 (Ala.1989):
"Subrogation is an equitable doctrine intended to prevent the insured from recovering twice for a single injury and to reimburse the insurer for payments it made that should, in fairness, be borne by another. See generally 73 Am.Jur.2d Subrogation § 1 (1974); 3 Appleman, Insurance Law and Practice § 1675 (1967). When the insured recovers the full amount of his damages from a third-party tort-feasor, the insurer is entitled to reimbursement of payments made on the policy. However, courts have generally held that no right of subrogation exists until the insured has recovered an amount in excess of his or her loss. Continental Bank & Trust Co. v. Alabama General Insurance Co., 274 Ala. 622, 150 So.2d 688 (1963); see also Lombardi v. Merchants Mutual Insurance Co., 429 A.2d 1290 (R.I.1981); Hughes v. State Farm Mut. Auto. Ins. Co., 604 F.2d 573 (8th Cir.1979); St. Paul Fire & Marine Insurance Co. v. W.P. Rose Supply Co., 19 N.C.App. 302, 198 S.E.2d 482 (1973), cert. denied, 284 N.C. 254, 200 S.E.2d 655 (1973).
"In 16 Couch on Insurance 2d (Rev. ed), § 61:64 (1983), we find the following:
"`[T]he insurer may in a given case have made the full payment required of it by its contract of insurance but this amount is not adequate to indemnify the insured in full. In such an instance, it has been held, in absence of waiver to the contrary, that no right of subrogation against the insured exists upon the part of the insurer where the insured's actual loss exceeds the amount recovered from both the insurer and the wrongdoer, after deducting costs and expenses. In other words, the insurer has no right as against the insured where the compensation received by the insured is less than his loss.' (Emphasis added [in Liao].)
"Is the general rule that a subrogee is not entitled to recover, absent full recovery by the insured (i.e., unless the damages recovered plus the insurance proceeds exceed the insured's loss), in any way altered by the fact that the subrogation interest is based on a contract between the parties? We recognize two distinct types of subrogation'"[l]egal subrogation," arising by operation of law where a surety having a legal liability pays a claim primarily owing by his principal, and "[c]onventional subrogation," grounded upon a lawful contract between the parties.' Continental Bank & Trust Co. v. Alabama General Insurance Co., supra, 274 Ala. at 625, 150 So.2d at 690. International argues that, because its subrogation right is based upon an insurance contract, equitable principles should not apply and it is entitled to be subrogated regardless of whether its insured's total recovery is less than the insured's actual loss. We are of the opinion that the better reasoned rule, one followed in a number of jurisdictions, is that equitable principles apply to all instances of subrogation except when the contract expressly provides otherwise. Westendorf v. Stasson, 330 N.W.2d 699 (Minn.1983); Wimberly v. American Cas. Co., 584 S.W.2d 200 (Tenn.1979); Wescott v. Allstate Ins., 397 A.2d 156 (Me.1979); Garrity v. Rural Mutual Insurance Co., 77 Wis.2d 537, 253 N.W.2d 512 (1977); Lyon v. Hartford Accident & Indem. Co., 25 Utah 2d 311, 480 P.2d 739 (1971), rev'd on other grounds, see Beck v. Farmers Ins. Exchange, 701 P.2d 795 (Utah 1985).
"In Westendorf v. Stasson, supra, at 703, the Supreme Court of Minnesota stated:

*787 "`Although subrogation can arise based on the equities of the situation alone, we are dealing here with "conventional subrogation" which is the product of an agreement between the parties. See 16 Couch on Insurance 2d § 61.2 (1966). However, subrogation remains an offspring of equity. Thus, even when the right to subrogation arises by virtue of an agreement, the terms of the subrogation will nonetheless be governed by equitable principles, unless the agreement clearly and explicitly provides to the contrary....
"`....
"`Given its origins in equity and its restitutionary purpose of preventing unjust enrichment, the general rule is that subrogation, whether arising from equity or contract, will be denied prior to full recovery. That is, absent express contract terms to the contrary, subrogation will not be allowed where the insured's total recovery is less than the insured's actual loss. See 16 Couch on Insurance 2d § 61:61 (1966); see also 3 Appleman, Insurance Law and Practice § 1675 (1967); Patterson, Essentials of Insurance Law § 33 (1957).' (Emphasis added [in Liao].)
"Similarly in Lyon v. Hartford Accident & Indemnity Co., supra, 480 P.2d at 744-45, the court stated:

"`Since subrogation is an offspring of equity, equitable principles apply, even when the subrogation is based on contract, except as modified by specific provisions in the contract. In the absence of express terms to the contrary, the insured is entitled to be made whole before the insurer may recover any portion of the recovery from the tortfeasor. If the one responsible has paid the full extent of the loss, the insured should not claim both sums, and the insurer may then assert its claim to subrogation.' (Emphasis added [in Liao].) [Footnote omitted.]
"We recognize that, while the doctrine of subrogation is of purely equitable origin and nature, it may be modified by contract."
548 So.2d at 164-66.
The holding in this case, of course, changes what I consider to be the holding in Liao, and, with the exception of classifying the Liao statement (that "equitable principles apply to all instances of subrogation except when the contract provides otherwise") as "dictum," 581 So.2d at 786, does not suggest why that statement in Liao, even if "dictum," was incorrect. In fact, a close look at the cases cited by the plurality for the conclusion that the doctrine of subrogation cannot be modified by contract shows that, in several of the cases, the courts in other jurisdictions recognized that the doctrine could be modified by a specific provision in the contractual agreement.
I have read the cases cited by the plurality in support of its conclusion that equitable principles of subrogation cannot be modified by contract, and while I find that Allum v. MedCenter Health Care, Inc., 371 N.W.2d 557 (Minn.App.1985), does seemingly stand for that proposition, I do not find the same situation is true in Garrity v. Rural Mut. Ins. Co., 77 Wis.2d 537, 253 N.W.2d 512 (1977), because the concluding paragraph in Garrity states: "We hold that because the contract here contains no language to the contrary, the normal rule of subrogation applies...." (Emphasis added.) It seems rather plain to me that had the contract provided otherwise, which is true in our present case, then the "normal rule of subrogation" would not apply. Similarly, in Westendorf v. Stasson, 330 N.W.2d 699 (Minn.1983), the Supreme Court of Minnesota, as the majority here notes, held that the right to subrogation could be modified or extinguished by contract.
The Court, in the exercise of its judicial powers, possibly has the authority to determine what types of agreements do or do not contravene the public policy of this State; but, even assuming the Court has that power, should it be exercised in a case like this, in view of the strong public policy stated in both the State and United States *788 Constitutions of ensuring the rights of individuals, in a free economy and as members of a free society, to contract as they please? The plurality says that "[o]ur review of the origins and development of the law of subrogation persuades us that a prerequisite to the right of subrogation is the full compensation of the insured" and that "[i]n effect, an attempt to contract away this prerequisite to the right of subrogation would defeat the right itself." I do not think that the law limits a hospital carrier's right to limit subrogation rights if it so chooses. While the record in this case, of course, does not indicate what negotiations occurred in connection with this policy, or the relative bargaining power of the negotiators, or the competition that may exist between health care insurers for the right to provide the coverage, I cannot conclude that a hospital carrier is precluded from writing a policy like the one in this case. Clearly this Court should not rewrite the policy.
The major reason, I suppose, for my dissent is that I believe that the role of this Court should be to interpret the agreements that come before us, rather than to fashion an absolute rule of law, as has been done here, especially when it is the role of the legislative branch or the executive branch, acting through the Department of Insurance, to fashion the rules governing the sale of insurance in this state. In this respect, I concur in what Mr. Justice Steagall says in his dissent.
In deciding this case as it does, the plurality has effectively created a new policy of insurance, because it admits that the subrogation clause under consideration is specific and unambiguous.
Because of these reasons, I must respectfully dissent.
HOUSTON, Justice (dissenting).
I do not understand the plurality opinion. If I am going to apply legal reasoning in this case, I must dissent. Therefore, I concur with Justice Maddox's dissent, and I write specially because I authored International Underwriters/Brokers, Inc. v. Liao, 548 So.2d 163 (Ala.1989).
While researching and writing Liao, I travelled through the "many dangers, toils, and snares" that the plurality and minority are traveling through in this case. The threshold question in Liao was stated as follows:
"Is the general rule that a subrogee is not entitled to recover, absent full recovery by the insured (i.e., unless the damages recovered plus the insurance proceeds exceed the insured's loss), in any way altered by the fact that the subrogation interest is based on a contract between the parties?"
548 So.2d at 165. Five members of this Court answered this question in the affirmative:
"We are of the opinion that the better reasoned rule, one followed in a number of jurisdictions, is that equitable principles apply to all instances of subrogation except when the contract expressly provides otherwise. [Citations omitted.]
"....
"We recognize that, while the doctrine of subrogation is of purely equitable origin and nature, it may be modified by contract."
548 So.2d at 165-66. The contract between International Underwriters/Brokers, Inc. and Ms. Liao had not been made part of the record. It was assumed, therefore, that the contract did not contain any specific provisions regarding subrogation that were contrary to established equitable principles. Consequently, the Court held that equitable principles controlled the disposition of the case. This holding was in accordance with the established law in other states:
"`[S]ubrogation remains an offspring of equity. Thus, even when the right to subrogation arises by virtue of an agreement, the terms of the subrogation will nonetheless be governed by equitable principles, unless the agreement clearly and explicitly provides to the contrary....
"`....
"`... [T]he general rule is that subrogation, whether arising from equity or contract, will be denied prior to full recovery. That is, absent express contract *789 terms to the contrary, subrogation will not be allowed where the insured's total recovery is less than the insured's actual loss.'"

548 So.2d at 165, quoting Westendorf v. Stasson, 330 N.W.2d 699, 703 (Minn.1983). (First emphasis added here; second emphasis added in Liao.)
If the plurality opinion is indeed the law of this state,[11] then it has the effect of overruling the holding in Liao, which is only a year old. This is done with citation to a minimum of authority that actually stands for the proposition that equitable subrogation cannot be modified by clear and explicit provisions in a contract: Allum v. MedCenter Health Care, Inc., 371 N.W.2d 557 (Minn.App.1985).[12] The plurality opinion, apparently under principles of "public policy," holds that the principles of equitable subrogation cannot be modified by clear and explicit provisions in a contract. Can this Court, in the name of "public policy," prohibit parties from modifying the doctrine of subrogation, which is of a purely equitable origin and nature, by clear and explicit provisions in a contract? Yes; see the plurality opinion. Should this Court do so? No; see Liao, supra; Sargeant v. International Union of Operating Engineers, Local Union 478 Health Benefits & Ins. Fund, 746 F.Supp. 241 (D.Conn.1990); Culver v. Insurance Co. of North America, 115 N.J. 451, 559 A.2d 400 (1989); Hill v. State Farm Mut. Auto. Ins. Co., 765 P.2d 864 (Utah 1988); Smith v. Manville Forest Products Corp., 521 So.2d 772 (La.App.1988), cert. denied, 522 So.2d 570 (La.1988); Ludwig v. Farm Bureau Mut. Ins. Co., 393 N.W.2d 143 (Iowa 1986); Dimick v. Lewis, 127 N.H. 141, 497 A.2d 1221 (1985); Knight v. Alefosio, 158 Cal. App.3d 716, 205 Cal.Rptr. 42 (Cal.Dist.Ct. App.1984); Peterson v. Ohio Farmers Ins. Co., 175 Ohio St. 34, 191 N.E.2d 157 (1963).[13] In my opinion, the courts in this state cannot make public policy by judicial fiat or ukase, the power to legislate having been reserved to the Legislature by the Alabama Constitution. Art. III, § 43 ("Separation of Powers"). Consequently, I believe that the opinions of justices and judges are subordinate to those of legislators concerning matters of public policy, unless constitutional issues are involved,[14] *790 and, just as Chief Justice Marshall believed that the "framers of the [United States Constitution] contemplated that instrument as a rule for the government of courts, as well as of the Legislature," Marbury v. Madison, 5 U.S. (1 Cranch) 137, 179, 2 L.Ed. 60 (1803) (emphasis in original), I believe that the framers of the Alabama Constitution contemplated that instrument as a rule for the government of the judicial branch as well as for the legislative branch of state government. Ala. Const. of 1901, Art. I, § 35; Art. III, §§ 42 and 43.
The right to be fully compensated for one's personal injuries is not an "inalienable right" protected by Art. I, § 1, of the Alabama Constitution. Likewise, the freedom to contractually modify the equitable principles of subrogation would not deprive a citizen of a remedy for an injury done him, so as to be a violation of the declaration of rights enunciated in Art. I, § 13, of the Alabama Constitution. After carefully reviewing the Alabama Constitution, as well as the United States Constitution, I can find "no constitutional guarantee, or fundamental principle of government, or chart of liberty or inalienable right that would be violated" by allowing freedom of contract in this area. Sheppard v. Dowling, supra, 127 Ala. 1, at 5-6, 28 So. 791, at 793 (1899).
I note that there is a strong preference in this State's Constitution for the protection of contractual obligations. The Constitution prohibits the impairment of contractual obligations by the legislative and judicial branches of state government. See Art. I, § 22 ("nor any law, impairing the obligations of contracts ... shall be passed by the legislature"), and Art. IV, § 95 ("[t]here can be no law of this state impairing the obligation of contracts by destroying or impairing the remedy for their enforcement").
Moreover, after examining the subrogation statutes that have been enacted by the Alabama Legislature, I can find nothing to support the plurality's cavalier disregard for the Constitution. To the contrary, it appears to me that the Legislature has indicated in at least two of its enactments that full compensation for personal injuries is not a prerequisite to the enforcement of subrogation rights in Alabama. See Ala. Code 1975, § 22-6-6, and Ala.Code 1975, § 25-5-11(a).
Suffice it to say that I am not convinced that this state's public policy prohibits freedom of contract in this area. If I knew that the money recovered in subrogation was not being factored into the calculation of future premium charges for health insurance, but, instead, was being retained by insurers as a mere windfall, then I would think there would be a great public policy reason for legislation that would prohibit a clause in future insurance contracts that permitted health insurers to recover first money from tort-feasors that caused the insureds' injuries.[15] There is no evidence before us that money recovered in subrogation cases is not being factored into the calculation of future premium charges for health insurance.
Perhaps my views are best expressed in 17 Am.Jur.2d Contracts § 178 (1964), which was quoted with approval by this Court in Milton Construction Co. v. State of Alabama Highway Department, 568 So.2d 784 (Ala.1990):
"`The courts are averse to holding contracts unenforceable on the ground of public policy unless their illegality is clear and certain. Since the right of *791 private contract is no small part of the liberty of the citizen, the usual and most important function of courts of justice is to maintain and enforce contracts rather than to enable parties thereto to escape from their obligations on the pretext of public policy, unless it clearly appears that they contravene public right or the public welfare. Rules which say that a given agreement is void as being against public policy are not to be extended arbitrarily, because "if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be enforced by courts of justice."
"`Many courts have cautioned against recklessness in condemning agreements as being in violation of public policy. Public policy, some courts have said, is a term of vague and uncertain meaning which it is the duty of the law-making power to define, and courts are apt to encroach upon the domain of that branch of the government if they characterize a transaction as invalid because it is contrary to public policy, unless the transaction contravenes some positive statute or some well-established rule of law. Other courts have approved the statement of an English judge that public policy is an unruly horse astride of which one may be carried into unknown paths. Considerations such as these have led to the statement that the power of the courts to declare an agreement void for being in contravention of sound public policy is a very delicate and undefined power and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt. The cautionary remarks may be interpreted to mean that in the determination of whether an agreement is against public policy there must be kept in view the rule that where there is no statutory prohibition, the courts do not readily pronounce an agreement invalid on the ground of policy or convenience, but, on the contrary, are inclined to leave men free to regulate their affairs as they think proper. In other words, the courts will not declare an agreement void on the ground of public policy unless it clearly appears to be in violation of the public policy of the state. A similar caution is one to the effect that before a court refuses to recognize an agreement which is made in good faith and stipulates for nothing that is malum in se or malum prohibitum it should be satisfied that the advantage to accrue to the public from its holding is certain and substantial, not theoretical or problematical. It has also been observed that the power to invalidate agreements on the ground of public policy is so far-reaching and so easily abused that it should be called into action to set aside or annul the solemn engagements of parties dealing on equal terms only in cases where the corrupt or dangerous tendency clearly and unequivocally appears upon the face of the agreement itself or is the necessary inference from the matters which are expressed, and that the only apparent exception to this general rule is to be found in those cases where the agreement, though fair and unobjectionable upon its face, is a part of a corrupt scheme and is made to disguise the real nature of the transaction.
"`It is no doubt correct to say that while public policy forbids the enforcement of an illegal or immoral agreement, it is equally insistent that those which are lawful and contravene none of its rules shall be enforced and not be held invalid on a bare suspicion of illegality. The fact is that since the courts are reluctant to declare an agreement void as against public policy, they will refuse to do so if by any reasonable construction the agreement can be upheld. Along this line, it is said that the paramount public policy is that freedom to contract is not to be interfered with lightly, and it is the court's duty to sustain the legality of a contract in whole or in part whenever it can do so.'"
568 So.2d at 788-89. (Some emphasis added in Milton Construction Co. is omitted here; other emphasis is added here.)
*792 For the foregoing reasons, I must respectfully dissent.
STEAGALL, Justice (dissenting).
In my opinion, International Underwriters/Brokers, Inc. v. Liao, 548 So.2d 163 (Ala.1989), clearly preserved the right of parties to alter traditional subrogation principles by contract, and I would not abrogate that right. I believe that before the plurality turns this page in the history of contract law as it relates to subrogation, this case and the companion cases (McKleroy v. Wilson, 581 So.2d 796 (Ala.1990), and Sharpley v. Sonoco Products Co., 581 So.2d 792 (Ala.1990)) should be remanded for the trial court to develop additional evidence on the impact of the plurality's holding. In my opinion, it would be very helpful to know how this result will affect premiums charged by insurers and how it will affect the availability of health insurance for the citizens of this State. Such evidence may show that subrogation claims involve only a minute portion of the claims considered. On the other hand, it could show that funds recovered as a result of subrogation as provided by contract are significant in the computation of premiums and in the negotiations leading to coverage. See Ala.Code 1975, § 10-4-109.
We face a crisis in this state and throughout our country in the health insurance field. Many of our citizens are without any type of health insurance and many others are only partially covered. The Court's holding may compound this most difficult situation. I could not join that holding without knowing how it will affect the availability and the cost of insurance coverage for our citizens.
Further, assuming that the data developed as the result of an in-depth study compelled this Court to abandon the principles set forth in Liao and prior cases, then I think that a proration of the sums recovered under equitable principles would be the procedure fairest to everyone concerned. It appears to me that to allow either the subrogee or the subrogor to recover "first money" ignores the true relationship of the parties and the realities of their respective losses. Indeed, the equitable principles upon which the doctrine of subrogation rests are misplaced and misapplied when either party's loss is compensated at the total expense of the other. To prorate the funds available would recognize the lack of funds to compensate for the respective losses sustained and would allow each claimant to recover in proportion to its respective losses. Under this approach, neither the subrogee nor the subrogor would collect "first money" but, instead, each would take a share proportionate to its respective loss; such a proration would avoid the inherent unfairness in the main opinion's distribution of the third-party recovery.
For the foregoing reasons, I respectfully dissent.
NOTES
[1] Because of our holding with respect to the primary issue, and because the third-party recovery is less than the injured insured's total loss, the secondary issue, whether the insurer/indemnitor may extend or enlarge its equitable right of subrogation by contract, is moot.
[2] For purposes of this opinion, we have quoted the policy language that Blue Cross included in its "Motion to Deny Plaintiff's Petition For Proration." We note that in their brief the appellants allege that on the date of Cynthia Powell's accident she was covered under a Blue Cross policy that contained a different subrogation clause. However, the above-quoted language is the only subrogation clause contained in the record and, thus, the only policy before this Court. Our holding in this case does not preclude the trial court from considering the issue of which policy is controlling in this case if that issue is properly presented to it.
[3] Although this policy language characterizes itself as "separate from and in addition to the administrator's right of subrogation," it would nonetheless reimburse the insurer for the money that it paid to its insured out of money recovered from the tort-feasor. Even though this portion of the policy does not give Blue Cross the right to "stand in the shoes" of its members, in all other respects this clause serves as a subrogation clause, and we, therefore, will apply the same principles that govern conventional subrogation. See International Underwriters/Brokers, Inc. v. Liao, 548 So.2d 163, 164 (Ala.1989), for a discussion of those principles.
[4] Likewise, the decision in this case is not limited to insurance companies but applies to any indemnitor who claims a right to subrogation.
[5] Operation of the "collateral source rule" would prevent the tort-feasor from introducing any evidence that the injured party has already recovered for his injuries by way of insurance. Pearson v. Birmingham Transit Co., 264 Ala. 350, 87 So.2d 857 (1956). But, we note that for civil cases filed after June 11, 1987, Ala.Code 1975, § 12-21-45, would allow evidence that an outside source has paid or will pay or reimburse the plaintiff for certain medical or hospital expenses. This statute also allows the plaintiff to introduce evidence of the cost of obtaining such reimbursement (i.e., premiums). "Upon proof by the plaintiff to the court that the plaintiff is obligated to repay the medical or hospital expenses which have been or will be paid or reimbursed, evidence relating to such reimbursement or payment shall be admissible." Ala.Code 1975, § 12-21-45(c) (Supp.1990).
[6] A more recent case indicates, however, that in spite of this clear language in Westendorf the Minnesota courts may be reluctant to enforce a subrogation agreement that would allow the insurer to be subrogated even though the insured is not first fully compensated, as against public policy. See Allum v. MedCenter Health Care, Inc., 371 N.W.2d 557, 560 (Minn.Ct.App.1985).
[7] We note that the right of subrogation may be affected by statute, as in the Alabama law of wrongful death, Ala.Code 1975 §§ 6-5-380 and 6-5-410. See Motors Insurance Corp. v. Loftin, 277 Ala. 331, 170 So.2d 281 (1965).
[8] We note that any reimbursement for compensation paid to an injured plaintiff under the Alabama Workmen's Compensation Act, Ala. Code 1975, § 25-5-1 et seq. (hereinafter the "Act"), by an employer or its insurer is specifically governed by § 25-5-11(a). Our holding in this case in no way interferes with the legislatively mandated scheme provided for under the Act.

We also note that, pursuant to the Act, only compensation, as opposed to medical payments, is reimbursable. For an analysis of this reimbursement scheme, see Maryland Cas. Co. v. Tiffin, 537 So.2d 469 (Ala.1988). All of the examples set forth in the present opinion are based on the premise that no compensation under the Act is involved.
[9] The plurality notes that "[f]or purposes of this opinion, we have quoted the policy language that Blue Cross included in its `Motion to Deny Plaintiff's Petition For Proration,'" 581 So.2d at 774. Because the plurality opinion is based upon the provisions of the Blue Cross policy, which it admits contains "specific language that gave Blue Cross first priority over any money that the insured collected from a third party," 581 So.2d at 774, my dissent addresses only those provisions that the plurality also addresses, "for purposes of this opinion."

In a brief filed in this case, there is reference to a group policy containing the following subrogation clause, which is much less specific than the one cited in the plurality opinion:
"SECTION XISUBROGATION
"In the event of payment or provision otherwise by the Administrator of any benefits under this Plan, the Administrator shall, to the extent thereof, be subrogated and shall succeed to all rights of recovery (whether in contract, tort, or otherwise) which the Member or any other person has against any person or organization and shall be subrogated and succeed to the proceeds of any settlement or judgment that may result from the exercise of any such rights of recovery. Upon payment or provision by the Administrator of any such benefits, the Member or any other person having any rights of recovery or proceeds therefrom shall execute and deliver such proceeds or such instruments or papers or do whatever else is necessary to secure to the Administrator such rights of recovery and proceeds and shall do nothing to prejudice such rights."
I do not address whether another policy may have been in effect at the time of Cynthia's injury. If her injury occurred while the first policy was in effect, and if her rights to medical benefits accrued under the first policy, it would appear that the subrogation provision in that policy would apply. See 19 Couch on Insurance 2d, § 644, at 864 (rev. ed. 1983); Appleman, Insurance Law and Practice, § 644, at 222 (1981), and Annot., "Cancellation or Modification of Master Policy as Termination of Coverage Under Group Policy," 68 A.L.R.2d 149 (1959). In International Underwriters/Brokers, Inc. v. Liao, 548 So.2d 163 (Ala.1989), the Court held, "[T]he better reasoned rule, one followed in a number of jurisdictions, is that equitable principles apply to all instances of subrogation except when the contract expressly provides otherwise." 548 So.2d at 165.
If, in fact, the subrogation provision quoted in this footnote was in effect at the time of Cynthia's injury, it is my opinion that that subrogation clause does not expressly provide that principles of subrogation would not apply in determining the rights of the parties. My dissent on the "primary issue" stated by the plurality should be read in light of these facts and these principles of law.
[10] If a statute, such as Alabama's Uninsured Motorist Statute, mandates the offering of uninsured motorist coverage, it has been held that subrogation and consent-to-settle clauses are void as violative of this policy expressed by the Legislature. Alabama Farm Bureau Mut. Cas. Ins. Co. v. Clem, 49 Ala.App. 457, 273 So.2d 218 (Ala.Civ.App.1973); Alabama Farm Bureau Mut. Cas. Ins. Co. v. Humphrey, 308 So.2d 255 (Ala. Civ.App.1975). But, see my dissent in Auto-Owners Ins. Co. v. Hudson, 547 So.2d 467 (Ala. 1989). Also, under Alabama law, all contracts insuring against loss from intentional wrongs are void as against public policy.
[11] I question the precedential value of the plurality opinion in this case. See, 21 C.J.S. Courts § 141 (1990); 20 Am.Jur.2d Courts § 195 (1965); Laurence, A Very Short Article on the Precedential Value of the Opinions From an Equally Divided Court, 37 Ark.L.Rev. 418, 426-27 nn. 24-38 (1983); see generally, City of Lakewood v. Plain Dealer Publishing Co., 486 U.S. 750, 108 S.Ct. 2138, 2148, 100 L.Ed.2d 771 (1988); First National Bank of Mobile v. Bailes, 293 Ala. 474, 306 So.2d 227 (1975); Phoenix Ins. Co. v. Stuart, 289 Ala. 657, 270 So.2d 792 (1972).
[12] Oddly, while citing Allum for the proposition that Minnesota courts "may be reluctant" to use the "clear language" in Westendorf to enforce contractual modifications of equitable subrogation interests, the plurality fails to recognize that at least three panels of the Minnesota Court of Appeals (other than the panel sitting in Allum) have used Westendorf`s "clear language" in the following subrogation cases:

Badger Equipment Co. v. Brennan, 431 N.W.2d 900, 904 (Minn.App.1988): "`Absent express contract terms to the contrary, subrogation will not be allowed where the insured's total recovery is less than the insured's actual loss'" (quoting Westendorf at 703);
Regie de l'assurance Automobile du Quebec v. Jensen, 389 N.W.2d 537, 539 (Minn.App.1986), rev'd on other grounds, 399 N.W.2d 85 (Minn. 1987): "Equitable principles apply to all instances of subrogation except when modified by specific provisions in the contract";
Pavel v. Norseman Motorcycle Club, 362 N.W.2d 5, 7-8 (Minn.App.1985): "Unless the contract explicitly provides otherwise, subrogation will not be allowed by an insurer where `the insured's total recovery is less than the insured's actual loss.'" (Quoting Westendorf at 703).
[13] See also, Blue Cross & Blue Shield United of Wisconsin v. Fireman's Fund Ins. Co. of Wisconsin, 140 Wis.2d 544, 411 N.W.2d 133 (1987), for its treatment of two other cases cited by the plurality, Rimes v. State Farm Mut. Auto. Ins. Co., 106 Wis.2d 263, 316 N.W.2d 348 (1982), and Garrity v. Rural Mut. Ins. Co., 77 Wis.2d 537, 253 N.W.2d 512 (1977).
[14] "It will suffice in reply to all this to say that this court is thoroughly committed to the doctrine that the constitution of the State, and the constitution of the United States so far as it has any application, are not the sources of the legislative power residing in the General Assembly of Alabama, nor in any sense grants of power to the Legislature, but only limitations upon that power, and that apart from the limitations imposed by those fundamental charts of government, the power of the Legislature has no bounds and is as plenary as that of the British Parliament: All which the General Assembly is not forbidden to do by the organic law, State or Federal, it has full competency to do."

Sheppard v. Dowling, 127 Ala. 1, 6, 28 So. 791, 793 (1899).
In an interesting article on the historical basis for judicial review of legislation, Professor Reid observes that Parliament's declaration of itself as the final judge (dernier judge) with authority to bind the colonies in all cases whatever (Declaratory Act, 6 Geo. 3, ch. 2 (1766)) may have been the origin of the doctrine of judicial review. John Phillip Reid, Another Origin of Judicial Review: The Constitutional Crisis of 1776 and the Need for a Dernier Judge, 64 N.Y.U.L. Rev. 963 (1989).
[15] See, e.g., Comment, "Denial of Subrogation RightsA Question for the Court or the Legislature?: Weinberg v. Dinger," 62 St. John's L.Rev. 99 (1987).