This wrongful death case arises from a motor vehicle accident that occurred on July 28, 1986. Essie Lee Sheffield, as the personal representative of the estate of Willard Burney, deceased, sued Star Freight, Inc., James Cook, Tommy Thompson, Linn B. Isbell, Southwire Machinery Division, Randy M. Chandler, and Sutherlin Leasing Company, alleging that the defendants had been negligent in operating their respective vehicles and that their negligence had caused the accident that killed Burney.
Defendants Sutherlin Leasing Company, Southwire Machinery Division, and Randy M. Chandler were dismissed. The court entered a default judgment against Linn B. Isbell. Liberty Mutual Insurance Company (Liberty Mutual), the uninsured/underinsured motorist insurer for Willard Burney, filed a motion for limited intervention, asserting its subrogation rights to any judgment received by Sheffield.[1] Prior to the trial of this case, Sheffield agreed to dismiss James Cook and Tommy Thompson, who were the agents of Star Freight at the time of the accident. Consequently, the only remaining defendant at the time of trial was Star Freight.
The jury returned a $200,000 verdict for the plaintiff Sheffield. Star Freight filed a motion for a judgment notwithstanding the verdict and a motion for a new trial. The trial court failed to dispose of these motions within 90 days, and this failure constituted a denial of the motions under A.R.Civ.P. 59.1. Star Freight appeals.
 Facts
On July 28, 1986, Willard Burney was killed in a tractor-trailer collision on Interstate Highway 20 in St. Clair County, Alabama. Burney, who was driving the "Bulldog" tractor-trailer truck involved in this accident, had been driving in a group with two other trucks for 10 or 11 miles prior to the accident. One of those trucks was owned by Southwire Machinery and was operated by Randy Chandler. That truck was travelling in the left eastbound lane of 1-20. Before the collision, the Southwire truck was running alongside Burney's vehicle. The other truck was owned by Star Freight and was operated by James Cook. The evidence presented was unclear as to which lane the Star Freight truck was travelling in. Cook and an eyewitness testified that the Star Freight truck was travelling in the left eastbound lane of 1-20 behind the Southwire truck. The plaintiff's expert witness testified that in his opinion the Star Freight truck was travelling in the right lane behind the Bulldog truck that Burney was driving.
As these three vehicles were travelling east on 1-20, another vehicle, operated by *Page 949 
Linn Isbell, entered the highway from the right shoulder of I-20. Apparently, Isbell was backing her vehicle on the emergency strip along the right side of the highway, lost control, and entered the highway. Defendant Star Freight contends that Isbell's vehicle caused the Bulldog truck driven by Burney to "jackknife" into the left lane directly in front of its truck. It further contends that the Southwire truck was knocked from the highway by a combination of the Bulldog truck's "jackknifing" into the left lane and the Isbell vehicle's crossing the highway. Star Freight stated that its truck collided with the left side of the "Bulldog" truck and that after the impact, its truck veered to the left into the median of the highway, where it overturned.
Based upon the opinion of John Sims, a mechanical engineer who testified as the plaintiff's expert, Sheffield contends that the Star Freight truck was "tailgating" the Bulldog truck, i.e., was following it too closely in the right lane. In reaching his opinion, Sims examined photographs and a videotape of the scene and considered the nature of the damage to the vehicles involved. He further examined a diagram drawn by Officer Jonathan Bryson, who was called to the scene of the accident; the deposition of Cook; and the Star Freight truck itself. Sims testified that he had considered the location and length of the various gouges and skid marks, the final resting places of the vehicles, and the damage to the vehicles to determine the sequence of events. Sims testified that in his opinion the Isbell vehicle passed in front of the Bulldog truck and was struck by the Southwire truck in the left eastbound lane. He also testified that the Star Freight truck collided with the rear of the Bulldog truck as that truck was jackknifing to a stop in the right eastbound lane. He further testified that the Star Freight truck came up the side of the "Bulldog" truck, which was jackknifing, and that the Star Freight truck struck the cab of the Bulldog truck, thus causing the driver of the Bulldog truck, Burney, to be ejected from his vehicle and be killed.
After Sims testified, the plaintiff rested, and the defendant indicated that it would not present any witnesses, and it also rested. The defendant moved for a directed verdict upon the basis that the evidence presented to the jury failed to establish any act of negligence on the part of Star Freight's agent that proximately caused or contributed to the death of Burney. Counsel for Star Freight stated:
 "The only evidence [the plaintiff has presented] of any contact with the [Bulldog] truck driven by Mr. Burney is that . . . evidence of Mr. Sims, their expert, [who] says it [the Star Freight truck] was in [the] right-hand lane, but that does [not] establish anything. It does [not] say at what point in [this] sequence of events [what] transpired. . . . From all that appears, the Burney truck moved directly in front of him [the Star Freight truck], assuming he [the Star Freight driver] was in the left-hand lane. That does [not] establish any act of omission or negligence on behalf of our driver. It is a total failure of proof, and we are entitled to a directed verdict."
The trial court denied the motion, and the case was submitted to the jury, which subsequently returned a $200,000 verdict for the plaintiff. Subsequently, the trial court denied Star Freight's motion for a judgment notwithstanding the verdict and its motion for a new trial.
 Arguments
Star Freight argues: (1) that the trial court erred in overruling its objection to John Sims's testifying as to his opinion regarding the proximate cause of the accident; (2) that the trial court erred in denying its motions for directed verdict, judgment notwithstanding the verdict, and new trial because of what it calls the lack of evidence supporting the plaintiff's contentions; and (3) that the judgment of $200,000 should be reduced because of Sheffield's receipt of $60,000 from Burney's uninsured/underinsured motorist insurance carrier, Liberty Mutual.
Sheffield contends: (1) that the trial court did not err by allowing her expert, John Sims, to testify, because, she says, *Page 950 
Star Freight failed to preserve the issue; the objection to the expert's opinions went to the weight of the testimony and not its admissibility; and there were substantial facts supporting the expert's opinions; (2) that the jury's verdict was not against the weight of the evidence so as to be palpably wrong and manifestly unjust; and (3) that the trial court did not err in denying Star Freight's motion to remit the verdict to $140,000 because of the plaintiff's receipt of $60,000 from Liberty Mutual, which was subrogated to a portion of the amount awarded to the plaintiff.[2]
 Discussion
1. The Expert Witness's Testimony
In Alabama Power Co. v. Robinson, 447 So.2d 148, 152-53
(Ala. 1983), this Court stated:
 "An expert witness may give his opinion based on his own knowledge of the facts, stating those facts and then his opinion, or he may give an opinion based upon a hypothetical question as to facts already in evidence or evidence to be subsequently admitted. Where personal observation is lacking, however, an expert witness cannot be permitted to give his expert opinion until facts upon which his opinion is to be based have been properly hypothesized before him.
". . . .
 "We have opined that '[e]xperts may be permitted to state facts known to them because of their expert knowledge but should not be allowed to substitute opinion for fact, although they can express an opinion on established or assumed facts.' "
(Citations omitted.) This Court in Macon County Comm'n v.Sanders, 555 So.2d 1054, 1058 (Ala. 1990), also stated:
 "The defendants argue that the trial judge improperly allowed Jack Chambliss, a traffic engineer testifying for the plaintiff, to give his opinion about the proximate cause of the accident. Experts may testify as to the ultimate issue in a case. A determination of whether a witness qualifies as an expert rests largely in the discretion of the trial judge, and that determination will be reversed only if found to be palpably wrong. An expert is defined as 'anyone whose opportunity or means of knowledge in a specialized art or science is better than that of the average juror or witness,' such that his testimony will aid the jury. Through the extensive questioning of Chambliss, it was shown that he possessed sufficient knowledge, training, and experience to qualify as an expert and to testify as to the cause of the accident, and thus it was not an abuse of discretion to allow him to testify."
In this case, John Sims was qualified as an expert, but in its objection the defendant's counsel stated:
 "MR. CHURCH: Judge, may I renew my objection? I'm not challenging Mr. Sims, the fact that he is a mechanical engineer, or the fact he is a reconstruction expert. What I'm saying [is that] there are not sufficient facts before him on which he can render opinions. It would be mere speculation or a guess as to what happened in the present posture of this evidence.
 "THE COURT: I'm going to overrule it. Of course, the credibility of the testimony would be for the jury to determine."
In its oral charge, the trial court instructed the jury as follows:
 "Ladies and gentlemen, there has been some testimony in this case by what we refer to as an expert. Now an expert is a witness who has gained some special knowledge on the facts of which he is testifying about beyond that [which] we commonly expect an ordinary lay person to have. It must be based upon training, [and] experience, in order to give him special knowledge on [the] particular fact circumstances [as to] which he is testifying. The witness testified in this case as an expert and has expressed [an] opinion based on assumed facts which were set forth in hypothetical questions. The *Page 951 
weight to be afforded such testimony is dependent entirely on the truth of the material facts stated in the hypothetical question. Before you consider the opinions of the expert, you should first examine carefully all of the material facts stated in the hypothetical question and be reasonably satisfied that they are proved to be true. [The fact that those witnesses] have been permitted to express an opinion or draw a conclusion on the facts [does not require you] . . . to accept the conclusions or expressed opinions of [those] expert witnesses, but [you] must determine for yourself the weight to be given to such testimony and evidence when considered in connection with all of the other evidence in the case."
In reviewing the record in this case, we conclude that the trial court did not err in overruling Star Freight's objection to John Sims's rendering an opinion concerning the proximate cause of the accident. The trial court indicated both at the time of the objection and in his instruction that the jury was to assign the appropriate weight to the expert's testimony when that testimony was viewed with all the evidence presented in the case. In this regard, there was no abuse of discretion on the trial court's part, because it was the jury's duty to determine the weight to be accorded to the testimony of the witnesses. See Alabama Power Co. v. Courtney, 539 So.2d 170
(Ala. 1988) (objection to testimony based upon inadequacy of facts goes to the weight of the evidence, not to its admissibility); Hagler v. Gilliland, 292 Ala. 262,292 So.2d 647 (1974) (differences in testimony either by another expert or by another witness go to the weight of the evidence rather than to the admissibility of the evidence).
2. Motions for Directed Verdict; Judgment Notwithstanding the Verdict; and New Trial A. Preservation of alleged error regarding motions for directed verdict, judgment notwithstanding the verdict, and new trial
Sheffield argues that Star Freight failed to preserve its right to appeal because, although Star Freight made a motion for a directed verdict at the close of the plaintiff's case, it failed to renew that motion after introducing Sims's affidavit into evidence. The following occurred after the plaintiff rested:
 "MR. CHURCH [defendant's counsel]: We would like to make a motion for a directed verdict, Your Honor.
"THE COURT: All right.
 "MR. CHURCH: Your Honor, the defendant Star Freight would move the court for a directed verdict in that the evidence before the court for the jury's consideration does not establish any act of negligence on behalf of the driver of the Star Freight truck, namely Mr. Cook, that proximately caused or contributed to the death of the decedent, Mr. Burney. The only evidence they have of any contact with the truck driven by Mr. Burney is . . . the evidence of Mr. Sims, their expert, which says it [the Star Freight truck] was in that right-hand lane, but that doesn't establish anything. It doesn't say at what point in [this] sequence of events [what] transpire[d] or what truck [was involved]. From all that appears, the Burney truck moved directly in front of him [Cook, Star Freight's driver], assuming he [Cook] was in the left-hand lane. That doesn't establish any act of omission or negligence on behalf of our driver. It is a total failure of proof, and we are entitled to a directed verdict.
 "THE COURT: At least the expert made a jury question out of it. So, that will be something that you can argue. Overruled.
 "MR. HOGAN [plaintiff's counsel]: I want to offer Exhibit 7.
"THE COURT: All right.
 "MR. FOX [defendant's counsel]: The affidavit of Mr. Sims, I want to put in evidence.
"THE COURT: All right."
In Barnes v. Dale, 530 So.2d 770 (Ala. 1988), this Court addressed whether it *Page 952 
could review a denial of a directed verdict, based upon a question of law, that was made at the close of the plaintiff's case but where the defendant had failed to renew his motion for a directed verdict at the close of all the evidence. This Court held:
 "[A] question of law addressed to the trial court at the close of the plaintiff's evidence, which strikes at the heart of the cause of action, need not, under all circumstances, be renewed at the close of all the evidence as a prerequisite to appellate review of the same question."
Id. at 776. In interpreting the requirements of A.R.Civ.P. 50(b) and an appellate court's exercise of discretion in entering a judgment contrary to a jury verdict, this Court relied on Bayamon Thom McAn, Inc. v. Miranda, 409 F.2d 968 (1st Cir. 1969). This Court wrote in Barnes:
 "[T]he trial court denied the defendant's motion for JNOV on the merits, noting that no motion for directed verdict had been made at the close of all evidence. Observing that rigorous adherence to Rule 50's requirements is sensible and in accord with its objectives, the First Circuit nonetheless rejected a straitjacket approach, which would have precluded appellate review absent a renewed directed verdict motion under the circumstances of that case:
 " 'This factor alone [the absence of a renewed motion] would be of no avail to appellants had the evidence subsequently presented been previously unrevealed, lengthy, or relevant to the issues raised by the motion for a directed verdict. . . . But [the evidence admitted after the directed verdict motion], occupying only two pages of transcript and involving no more than a few minutes, held no surprises. The evidence, being taken from earlier identified exhibits and a deposition, did not bear on the question of defendants' negligence and contained one item directed at impeaching testimony which had been given by the mother. There is no possibility that any of this could have changed the court's mind in ruling on a repeated motion. The factual and procedural contexts were very similar to those in United States v. 353 Cases, 247 F.2d 473
(8th Cir. 1957), where, with a trial virtually at an end, the court held that rebuttal on subordinate issues after a motion had been made did not have the effect of waiving the legal issue raised by the motion. . . . In the absence of any authority to the contrary, in a case combining the kind of judicial assurance concerning preservation of rights at the time of motion and the brief and inconsequential evidence following the motion, we deem that this is a proper case for the liberal construction commended by Fed.R.Civ.P. 1 in the interests of justice. . . .'
"Bayamon, 409 F.2d at 971-72.
 "It is significant, here, that two of the defendants . . . were called as witnesses for the plaintiff, so that at the close of the plaintiff's evidence nothing remained to be proved with respect to the evidentiary basis of the defendants' immunity defense. The evidence submitted by the defendants after the close of the plaintiff's evidence did not bear on the legal question of immunity. As in Bayamon, there is no reasonable possibility that the evidence submitted by the defendants following the denial of their motion for directed verdict could have changed the trial court's mind in ruling on their repeated immunity defense. . . . The evidence of record bearing on this issue, then, was fully ripened at the close of the plaintiff's evidence when the defendants moved for a directed verdict on the purely legal ground of immunity."
Id. 530 So.2d at 779-80 (footnote omitted).
We conclude that Star Freight preserved its right to appeal even though it did not technically renew its motion for directed verdict after requesting that Sims's affidavit be placed into evidence. Like the evidence in Bayamon and Barnes, the affidavit that was admitted after Star Freight made its directed verdict motion held no surprises, and, in fact, it had been marked as an exhibit and testified to by Sims on cross-examination. The admissibility of evidence is a question of law for the trial *Page 953 
court to decide. Also, it is a question of law for the trial court whether to grant Star Freight's directed verdict motion, which struck at the heart of Sheffield's claim by a contention that Sheffield had failed to show that Star Freight proximately caused Burney's death. Consequently, Star Freight preserved its right to appeal the trial court's denial of its motions for directed verdict, judgment notwithstanding the verdict, and new trial.
 B. Motions for directed verdict and judgment notwithstanding the verdict
Star Freight argues that the trial court erred in denying its directed verdict and J.N.O.V. motions because, it says, there was a lack of evidence supporting the plaintiff's case. InBurroughs Corp. v. Hall Affiliates, Inc., 423 So.2d 1348, 135354 (Ala. 1982), this Court stated:
 "[W]e reiterate the two standards utilized by this Court in reviewing evidentiary challenges:
 " 'For the sake of clarity, we restate the familiar: Other than objections to admissibility, evidentiary challenges are divided into two separate and distinct categories: (1) sufficiency of the evidence, raised by motions for directed verdict and for J.N.O.V. and measured by the objective "scintilla" ["substantial evidence" since June 11, 1987, see Ala. Code 1975, § 12-21-12] rule; and (2) weight and preponderance of the evidence, raised by motion for a new trial, and measured by the more subjective "palpably wrong, manifestly unjust" standard.' Casey v. Jones, 410 So.2d 5, 8 (Ala. 1982)."
See also Mallory v. Hobbs Trailers, 554 So.2d 966 (Ala. 1989).
Having reviewed the record, we conclude that the trial court did not err in denying Star Freight's motions for directed verdict and judgment notwithstanding the verdict. "The standard of review for the denial of motions for a directed verdict and a judgment notwithstanding the verdict is whether the party with the burden of proof has produced sufficient evidence to require a jury determination." Macon County Comm'n v. Sanders,555 So.2d 1054, 1056 (Ala. 1990). In this case, Sheffield produced sufficient evidence to present a question requiring the jury to make a determination. The introduction of the expert witness's testimony in this case created a factual issue for the jury concerning the proximate cause of Burney's death; thus, the trial court's denial of Star Freight's motions for directed verdict and judgment notwithstanding the verdict was proper.
C. Motion for New Trial
Star Freight also argues that the trial court erred in denying its motion for a new trial, because, it argues, the verdict was against the weight of the evidence. InBurroughs Corp. v. Hall Affiliates, Inc., supra, at 1353-54, this Court stated that in reviewing sufficiency-of-the-evidence claims raised by motions for new trial, the "palpably wrong, manifestly unjust" standard is used, whereby the weight and preponderance of the evidence is examined. See also Casey v.Jones, 410 So.2d 5 (Ala. 1982). In Burroughs, supra, at 1354, this Court further stated:
 "[W]here the sufficiency of the evidence to support the verdict is at issue, only the tendencies of the evidence most favorable to the verdict are reviewed; and such inferences as the jury was free to draw are indulged. W.T. Ratliff Co. v. Purvis, 292 Ala. 171, 178, 291 So.2d 289
(1974); First Southern Federal Savings Loan Association of Mobile v. Nicrosi, 333 So.2d 780, 782 (Ala. 1976)."
Reviewing the evidence in this case most favorably to the verdict, we conclude that the jury was free to draw its own conclusions based on all the evidence presented. In its jury instruction, the trial court indicated that the jury was to assign the appropriate weight to the expert's testimony when that testimony was viewed with all the evidence presented in the case. See prior discussion supra. In this regard, the trial court was not palpably wrong or manifestly unjust in denying the defendant's motion for new trial, because it was the jury's duty to determine the weight to be *Page 954 
accorded to the testimony of the witnesses. See Hollis v.Scott, 516 So.2d 576 (Ala. 1987).
3. Subrogation
During the trial of this case, Sheffield apparently believed that Liberty Mutual had a right to subrogation with respect to its payment of uninsured motorist insurance proceeds. However, she now argues that, under the authority of Powell v. BlueCross Blue Shield of Alabama, 581 So.2d 772 (Ala. 1990), andMotors Ins. Corp. v. Loftin, 277 Ala. 331, 170 So.2d 281
(1964), the uninsured motorist benefits she received were received pursuant to a contract obligation that was owned by the estate. Consequently, Sheffield contends that Liberty Mutual is not entitled to subrogation because, she argues, it cannot be subrogated to funds paid to the personal representative pursuant to Alabama's Wrongful Death Statute.
Liberty Mutual contends that the Loftin case's distinction and rationale was limited by the recent decision of Sprouse v.Hawk, 574 So.2d 754 (Ala. 1990), wherein this Court held that uninsured motorist benefits paid in a wrongful death case are to be distributed according to the statute of descent and distribution. Liberty Mutual contends that these uninsured motorist benefits are not payable to the decedent's estate but rather are payable to the decedent's personal representative in lieu of damages recovered under the wrongful death statute. Liberty Mutual further contends that it is also entitled to subrogation under the rationale outlined in Powell, supra.
The subrogation issue in this case comes to us in a confused state as a result of Liberty Mutual's limited intervention at trial and the development of the issue after much of the litigation had taken place. After extensive review, we conclude that the primary issue under these facts is whether Liberty Mutual can enlarge or extend its equitable right of subrogation by contract.[3]
In Powell, this precise issue was not addressed, because the issue was moot. Powell, note 1. The Court in Powell addressed whether an insurer, under a subrogation contract, may subrogate itself to its insured's recovery from a third-party tortfeasor when that recovery does not exceed the insured's total loss. This Court held that no right of subrogation existed until the insured had fully recovered.
This Court recognizes the following:
 "The doctrine of subrogation has been firmly rooted in American jurisprudence for well over a century. While the doctrine was originally limited to equity cases, it has been extended by modern courts to 'embrace nearly every situation where the debt of one is paid by a non-volunteer who is only secondarily liable for such [a] debt.' Thus, subrogation is an attempt to insure that a debt is ultimately discharged by the party who is primarily responsible for the discharge of the debt. As long as our society feels that this is an important goal, subrogation will remain an important judicial doctrine for achieving that end.
 "In recent years, subrogation has become primarily associated with the insurance industry. This seems to be due largely to two factors: first, the great bulk of subrogation litigation is initiated by insurance companies; and second, since the insurer agrees to assume loses for which a third party can often be held primarily responsible at law, contracts underwritten by insurance companies possess a natural affinity to subrogation. Thus, the principles which govern the application of subrogation have a significant impact on all facets of the insurance industry."
Note, Conflicts Regarding the "No Subrogation Against Insured"Rule, 29 Drake L.Rev. 811, 811-12 (1980) (footnotes omitted). See also Powell, supra; International Underwriters/Brokers,Inc. v. Liao, 548 So.2d 163 (Ala. 1989). *Page 955 
In Powell, this Court reiterated the general subrogation law:
 "The entire law of subrogation, conventional or legal, is based upon equitable principles. International Undewriters/Brokers, Inc. v. Liao, 548 So.2d 163, 165 (Ala. 1989). The equitable considerations that are the underpinnings of subrogation are (1) that the insured should not recover twice for a single injury, and (2) that the insurer should be reimbursed for payments it made that, in fairness, should be borne by the wrongdoer. Id. In International Under-writers, we stated:
 " '[N]o right of subrogation against the insured exists upon the part of the insurer where the insured's actual loss exceeds that amount recovered from both the insurer and the wrongdoer, after deducting costs and expenses. In other words, the insurer has no right as against the insured where the compensation received by the insured is less than the loss.'
"548 So.2d at 164-65.
". . . .
 "The principle of indemnity was the primary reason for the adoption of subrogation in insurance cases. See International Underwriters, supra; North River Ins. Co. v. McKenzie, 261 Ala. 353, 359, 74 So.2d 599, 604 (1954). The insurer's obligation was to make the insured whole, but not more than whole. Accordingly, subrogation originally served to prevent the insured from receiving a double recovery by first collecting the insurance proceeds and then suing the tort-feasor or other third parties, so as to recover again for his injury. A second reason for the adoption of subrogation in insurance cases is what has been called 'the moralistic basis of tort law as it has developed in our system.' Kimball Davis, The Extension of Insurance Subrogation, 60 Mich.L.Rev. 841, 841 (1962). In other words, the wrongdoer should bear the burden of reimbursing the insurer for payments it made to the insured because of the wrong-doer's actions. See International Under-writers, supra; City of Birmingham v. Walker, 267 Ala. 150, 158, 101 So.2d 250, 256 (1958).
 "Subrogation accomplished these goals by allowing the insurer to 'stand in the shoes' of the insured in order to recover its payments from the tort-feasor who caused the damage. . . .
". . . .
 "In the present case, the contract of insurance would abrogate these underlying principles of subrogation by reimbursing the insurer even though the insured has not fully recovered for her loss."
Powell, 581 So.2d at 774-75.
In regard to uninsured motorist insurance, 12A Couch on Insurance 2d § 45:655 at 221-22 (1981 rev. ed.), states:
 "It is provided that the insurer shall be subrogated in any suit against the tortfeasor to the extent of the proceeds which it has been called upon to pay.
 "[However,] [t]he statute will govern subrogation rights in a UM situation. Subrogation should not be allowed until the claimant has recovered the total amount of his actual loss. As with all subrogation, the UM carrier can have no better rights against the tortfeasor than would the insured."
(Emphasis added.)
This Court has recognized that a right of subrogation exists in uninsured/underinsured motorist insurance cases. InHardy v. Progressive Ins. Co., 531 So.2d 885 (Ala. 1988) (summary judgment for the insurer reversed because the record failed to support the judgment), this Court stated that an underinsured motorist insurance carrier had no right of subrogation as to payments that were within a tort-feasor's limits of liability, but did have a right of subrogation for sums paid by the insurer in excess of the tort-feasor's limits of liability. See also Auto-Owners Ins. Co. v. Hudson,547 So.2d 467 (Ala. 1989) (to preserve right of subrogation for underinsured motorist insurance proceeds, insurer must pay its insured the amount that the tort-feasor offers to pay in a settlement); Progressive Specialty Ins. v. Hammonds, *Page 956 551 So.2d 333 (Ala. 1989) (applying principle set forth in Auto-OwnersIns. Co. v. Hudson). However, as stated above, the issue here is not whether Liberty Mutual has a right of subrogation but rather whether Liberty Mutual can extend or expand its right of subrogation by contract.
In arguing that it has a right to extended or expanded subrogation, Liberty Mutual relies on the Florida case ofInternational Sales-Rentals Leasing Co. v. Nearhoof,263 So.2d 569 (Fla. 1972). In Nearhoof, the plaintiffs were injured in a multivehicular accident. They settled their uninsured motorist insurance claim for $19,500 and signed a release and trust agreement. The agreement provided:
 " '[W]e . . . agree to hold in trust for the benefit of the Company [GEICO] all rights, claims, and causes of action which [we] have or may have against the person or persons or organization legally responsible in whole or in part for the injuries and damages sustained by the injured arising from this accident.' "
Id. at 570. The uninsured motorist insurance carrier, in reliance upon the release and trust agreement, intervened in the plaintiffs' action against an insured joint tort-feasor. The jury returned a $70,500 verdict for the plaintiffs, and the uninsured motorist insurance carrier moved to recover its $19,500 payment. The trial court held that the carrier did not have a right of subrogation because the insureds recovered from an insured joint tort-feasor. The trial court allowed the joint tort-feasor to set-off $19,500 against the $70,500 judgment.
On appeal to the District Court of Appeal, that court concluded (1) that the defendant joint tort-feasor had no right of set-off and (2) that the trial court had correctly decided the subrogation issue. However, on appeal to the Florida Supreme Court, that court stated in regard to the subrogation issue:
 "[I]t is our view that . . . [the uninsured motorist insurance carrier] is entitled to be subrogated as intervenor to the extent of the amounts it paid the [plaintiffs] as their uninsured motorist's carrier. We conclude subrogation in the $70,500 recovery was intended by Section 627.0851(4), F.S. 1969, then in effect, reading as follows:
 " '(4) In the event of payment to any person under the coverage required by this section and subject to the terms and conditions of such coverage, the insurer making such payments shall, to the extent thereof, be entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of such person against any persons or organization legally responsible for the bodily injury for which such payment is made, including the proceeds recoverable from the assets of the insolvent insurer.' "
Id.
In holding that the uninsured motorist insurance carrier inNearhoof had a right of subrogation, the Florida Supreme Court relied on the Florida statute, which provided that an uninsured motorist insurance carrier had a right of subrogation where the insured recovered from any person or organization legally liable.[4] The Alabama Uninsured Motorist Statute has no similar provision. In fact, Alabama's Uninsured Motorist Statute makes no provision for subrogation in uninsured motorist cases.
The Uninsured Motorist Statute, Ala. Code 1975, § 32-7-23, provides:
 "(a) No automobile liability or motor vehicle liability policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance or use of a motor vehicle *Page 957 
shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless coverage is provided therein or supplemental thereto, in limits for bodily injury or death set forth in subsection (c) of section 32-7-6, under provisions approved by the commissioner of insurance for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles because of bodily injury, sickness or disease, including death, resulting therefrom. . . ."
(Emphasis added.)
As stated by this Court, the Uninsured Motorist Statute is construed so as to assure that a person injured by anuninsured motorist will be able to recover the total amount of his damages and that the insurer will not be allowed to insert provisions in the policy limiting the insured's recovery.Safeco Ins. Co. of America v. Jones, 286 Ala. 606,243 So.2d 736 (1970); Alabama Farm Bureau Mut. Cas. Ins. Co. v. Clem,49 Ala. App. 457, 273 So.2d 218 (1973).
In Auto-Owners Ins. Co. v. Hudson, 547 So.2d 467, 468
(Ala. 1989), this Court stated:
 "[T]he uninsured/underinsured motorist benefits at issue are mandated by § 32-7-23, Code of Alabama
(1975). The purpose of the statute is to provide ' " 'coverage * * * for the protection of persons insured thereunder who are legally entitled to recover damages from the owner or operators of uninsured motor vehicles.' " ' Alabama Farm Bureau Mut. Cas. Ins. Co. v. Clem, 49 Ala. App. 457, 461, 273 So.2d 218 (Ala.Civ.App. 1973), quoting Safeco Ins. Co. of America v. Jones, 286 Ala. 606, 243 So.2d 736 (1970). In fact, unless an insured rejects such coverage, an insurance company is required to provide uninsured/underinsured coverage in an automobile liability policy. Insurance Co. of North America v. Thomas, 337 So.2d 365
(Ala.Civ.App. 1976)."
See also Sprouse v. Hawk, 574 So.2d 754 (Ala. 1990).
In this case, the parties admit that Liberty Mutual paid the $60,000 uninsured motorist benefits on behalf of Linn B. Isbell, the uninsured motorist, but that no money damages were ever assessed on the default judgment rendered against her. The parties also admit that the $200,000 judgment for Sheffield was rendered solely against Star Freight. Star Freight was not an uninsured motorist in this case. Liberty Mutual, under a "Release and Trust Agreement" signed by Sheffield purports to subrogate itself to Sheffield's recovery regardless of whether that recovery is from the uninsured motorist or another insured tortfeasor.
This "Release and Trust Agreement" reads:
"RELEASE AND TRUST AGREEMENT
 "KNOW ALL MEN BY THESE PRESENTS that the undersigned Essie Sheffield as administratrix of the estate of Willard Burney, being of full age, for the sole consideration of Sixty Thousand 
00/100 ($60,000.00) paid by LIBERTY MUTUAL INSURANCE COMPANY and/or LIBERTY MUTUAL FIRE INSURANCE COMPANY (hereinafter referred to as LIBERTY), the receipt of which is hereby acknowledged, hereby releases, acquits, and forever discharges LIBERTY from all claims, known or unknown, that the undersigned may ever have against LIBERTY under the uninsured motorist coverage of its policy NO. AT1-751-001774-035 arising out of an accident that occurred on the 28th day of June 1986 at or near I-20; Pell City, Alabama.
 "The undersigned further agrees to do whatever is proper to secure any rights he/she may have against any party who may be legally liable for the damages sustained by the undersigned in said accident, including taking in his/her own name any action necessary or appropriate to recover such damages. In the event of such recovery by judgment or settlement the undersigned shall reimburse LIBERTY, to the extent of its payments hereunder, less a pro *Page 958 rata share of the cost of securing such judgment or settlement, out of the proceeds of such recovery.
The undersigned shall notify LIBERTY of all significant developments in any action undertaken to secure the undersigned's rights and shall execute and deliver to LIBERTY such instruments and papers as may be appropriate to secure the rights and obligations of the undersigned and LIBERTY established by the provisions of this agreement."
(Emphasis added.)
In addition to the "Release and Trust Agreement," the insurance policy between Burney and Liberty Mutual provided:
"C. OUR RIGHT TO RECOVER FROM OTHERS
 "If we make any payment, we are entitled to recover what we paid from other parties. Any person to or for whom we make payment must transfer to us his or her rights or recovery against any other party. This person must do everything necessary to secure these rights and must do nothing that would jeopardize them."
(Emphasis original.)
It is apparent that Liberty Mutual attempted to extend or expand its right of subrogation so as to recover its payment of uninsured motorist insurance proceeds in the event Sheffield recovered from any party, regardless of whether that party was an uninsured motorist. Liberty Mutual did this by requiring the execution of a "Release and Trust Agreement" by Sheffield. This agreement, however, contravenes the Uninsured Motorist Statute. We note that in Alabama Farm Bureau Mut. Casualty Ins. Co. v.Humphrey, 54 Ala. App. 343, 308 So.2d 255 (1975), the Court of Civil Appeals considered whether a trust agreement or subrogation provisions in an insurance policy entitled the insurer to subrogate itself to any proceeds of settlement the insured received from any person legally liable for his injury. The Court of Civil Appeals held:
 "[T]he trust agreement or subrogation clause, when applied to settlement with or recovery from tort-feasors other than the uninsured motorist is invalid and contrary to the intent of the uninsured motorist statute."
Id. 54 Ala. App. at 345, 308 So.2d at 257-58.
The purpose of the Uninsured Motorist Statute is to protect insured persons who are legally entitled to recover damages from owners or operators of uninsured motor vehicles. An uninsured motorist insurance carrier can not limit or restrict that coverage. Under the facts in this case, the "Release and Trust Agreement" does purport to limit or restrict the uninsured motorist coverage.
Like the contract in Powell, where this Court held that the contract abrogated the principles of subrogation because the insurer sought reimbursement before the insured had fully recovered, the "Release and Trust Agreement" in the present case contravenes the Uninsured Motorist Statute.
Because the "Release and Trust Agreement" in this case contravenes the stated purpose of Alabama's Uninsured Motorist Statute, we hold that there is no extended or expanded right of subrogation in this case.[5]
4. Set-off
Star Freight argues that it has a right to a $60,000 set-off because, it says, the "Release and Trust Agreement" was apro tanto release.[6] Star Freight contends *Page 959 
that, because the jury awarded Sheffield punitive damages of $200,000, it is liable as a joint tort-feasor only to pay $140,000 of the $200,000 judgment. We disagree. Although there was a $60,000 payment made by the plaintiff's uninsured motorist insurance carrier pursuant to its contract, there is no evidence that the "Release and Trust Agreement" was apro tanto release; the $60,000 was not paid by Isbell, and Isbell was not released. Sheffield did not go to the jury against Isbell; rather, Star Freight was the sole defendant at trial. At trial, the jury determined liability and wrongful death punitive damages against Star Freight. Star Freight failed to object to the trial court's oral charge to the jury in respect to Isbell's liability for damages. Further, the "Release and Trust Agreement" was not even offered into evidence. See, e.g., Tatum v. Schering Corp., 523 So.2d 1042
(Ala. 1988); Bucyrus-Erie Co. v. Von Haden, 416 So.2d 699
(Ala. 1982).[7] Thus, from the record before this Court, it appears that Star Freight failed to preserve this issue for appellate review. See, e.g., Gotlieb v. Collat, 567 So.2d 1302
(Ala. 1990); Campbell v. Alabama Power Co., 567 So.2d 1222
(Ala. 1990); Green v. Taylor, 437 So.2d 1259 (Ala. 1983).
For the foregoing reasons, we affirm the trial court's judgment.
AFFIRMED.
MADDOX, ADAMS, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur.
[1] Sheffield, as the administratrix of Willard Burney's estate, had signed a "Release and Trust Agreement" with Liberty Mutual, which stated:
 "RELEASE AND TRUST AGREEMENT "KNOW ALL MEN BY THESE PRESENTS that the undersigned Essie Sheffield as administratrix of the estate of Willard Burney, being of full age, for the sole consideration of Sixty Thousand 00/100 ($60,000.00) paid by LIBERTY MUTUAL INSURANCE COMPANY and/or LIBERTY MUTUAL FIRE INSURANCE COMPANY (hereinafter referred to as LIBERTY), the receipt of which is hereby acknowledged, hereby releases, acquits, and forever discharges LIBERTY from all claims, known or unknown, that the undersigned may ever have against LIBERTY under the uninsured motorist coverage of its policy NO. AT1-751-001774-035 arising out of an accident that occurred on the 28th day of June 1986 at or near 1-20; Pell City, Alabama. "The undersigned further agrees to do whatever is proper to secure any rights he/she may have against any party who may be legally liable for the damages sustained by the undersigned in said accident, including taking in his/her own name any action necessary or appropriate to recover such damages. In the event of such recovery by judgment or settlement the undersigned shall reimburse LIBERTY, to the extent of its payments hereunder, less a pro rata share of the cost of securing such judgment or settlement, out of the proceeds of such recovery. The undersigned shall notify LIBERTY of all significant developments in any action undertaken to secure the undersigned's rights and shall execute and deliver to LIBERTY such instruments and papers as may be appropriate to secure the rights and obligations of the undersigned and LIBERTY established by the provisions of this agreement."
[2] Sheffield subsequently changed her position on Liberty Mutual's rights to subrogation based upon this Court's decision in Powell v. Blue Cross Blue Shield of Alabama, 581 So.2d 772
(Ala. 1990). See discussion under the heading "Subrogation,"infra.
[3] We do not consider in this case whether a right of subrogation exists in regard to wrongful death cases; rather, we address only the issue of whether an uninsured motorist insurance carrier may extend or expand its right of subrogation through contract.
[4] We note that two jurisdictions allow an uninsured motorist carrier to recover where its insured recovers from any party legally liable. However, the legislatures in those jurisdictions have provided for this type of subrogation by statute. See, e.g., Ackerman v. Prudential Property Cas. Ins.Co., 83 Ill. App.3d 590, 39 Ill.Dec. 150, 404 N.E.2d 534
(1980); Stroud v. Liberty Mut. Ins. Co., 429 So.2d 492
(La.Ct.App. 1983). Cf. Harthcock v. State Farm Mut. Automobile Ins.Co., 248 So.2d 456 (Miss. 1971) (construed uninsured motorist statute to allow subrogation only when the injured party had recovered from the uninsured motorist).
[5] We note that even if the "Release and Trust Agreement" did not contravene the stated purpose of the Uninsured Motorist Statute, Liberty Mutual would still have no right of subrogation. Under the general principles of subrogation a subrogee steps into the shoes of its subrogor and that subrogee only gets those rights that its subrogor has. The subrogee can have no greater rights. In this case, Isbell was dismissed by the trial court as a party; thus Sheffield had no right to proceed against Isbell. Consequently, Liberty Mutual, as Sheffield's subrogee, had no right to proceed against Isbell. See discussion of subrogation supra.
[6] Star Freight relies on the case of Batchelor v. Brye,421 So.2d 1267 (Ala.Civ.App. 1982), to support its position. However, that case is distinguishable. See Cooper v. Aplin,523 So.2d 339 (Ala. 1988) (Maddox, J., dissenting) (distinguishingBatchelor v. Brye).
In Batchelor, the plaintiff settled with its uninsured motorist insurance carrier for $10,000 but proceeded against two joint tort-feasors. The jury returned a $30,000 verdict against both tort-feasors. One tort-feasor paid $20,000 into court and moved to have the $30,000 judgment satisfied. The motion was granted and the plaintiff appealed, arguing that the $10,000 paid by the uninsured motorist insurance carrier should not be treated as a partial payment of the $30,000 judgment. The Court of Civil Appeals disagreed with the plaintiff, reasoning that the plaintiff could recover only the amount that the jury decided was her total damages as to both tort-feasors.
In the present case, only the liability of, and damages against Star Freight were determined by the jury. The damages against Isbell were never considered by the jury in this case; thus Star Freight has no right of set-off against the proceeds paid on behalf of the uninsured motorist, Isbell.
[7] As noted in Powell v. Blue Cross Blue Shield of Alabama,581 So.2d 772, note 5 (Ala. 1990), the operation of the "collateral source rule" would prevent the introduction of evidence indicating that the plaintiff received insurance proceeds. However, we note that for cases filed after June 11, 1987, Ala. Code 1975, § 12-21-45, may apply. Section 12-21-45
provides:
 "(a) In all civil actions where damages for any medical or hospital expenses are claimed and are legally recoverable for personal injury or death, evidence that the plaintiffs medical or hospital expenses have been or will be paid or reimbursed shall be admissible as competent evidence. In such actions upon admission of evidence respecting reimbursement or payment of medical or hospital expenses, the plaintiff shall be entitled to introduce evidence of the cost of obtaining reimbursement or payment of medical or hospital expenses.
". . . .
 "(c) Upon proof by the plaintiff to the court that the plaintiff is obligated to repay the medical or hospital expenses which have been or will be paid or reimbursed, evidence relating to such reimbursement or payment shall be admissible.
 "(d) This section shall not apply to any civil action pending on June 11, 1987."
In the present case, however, neither Sheffield nor Star Freight attempted to introduce the "Release and Trust Agreement" into evidence; thus we are not presented with this issue.