On July 10, 1990, Jerry Plowman was killed in a two-vehicle automobile accident. Plowman was driving a truck owned by his employer, Roland Pugh Construction Company. The driver of the other vehicle involved in the collision was Christopher Lee Turner. The vehicle driven by Plowman was covered by a liability insurance policy issued by Aetna Casualty Surety Company. Turner's vehicle was covered by State Farm Mutual Automobile Insurance Company.
Elizabeth Plowman, as executrix of Jerry Plowman's estate, sued Turner on July 21, 1990, alleging wrongful death. On October 18, 1990, Plowman sued Aetna, in her amended complaint, for underinsured motorist benefits, because Turner's policy with State Farm had a limit of $100,000 and Plowman was claiming more than $100,000 in damages. Turner filed a counterclaim against Plowman, claiming damages, alleging that Jerry Plowman had negligently caused the accident. Aetna filed a cross-claim against Turner for any amount that Aetna pays to Plowman on the underinsured motorist claim.
The trial court, on February 20, 1992, entered a summary judgment in favor of Aetna and against Plowman on the underinsured motorist claim.
Plowman's claim against Turner and Turner's counterclaim against Plowman went to trial, resulting in a $1,000,000 verdict for Plowman and a $10,000 verdict for Turner. Plowman then appealed from the summary judgment entered in favor of Aetna. The trial court granted a motion for a new trial on the claims of Plowman and Turner. Before the new trial, Plowman and Turner entered into settlement negotiations.
On December 7, 1992, Plowman wrote Aetna, informing Aetna that State Farm, as Turner's insurer, was offering to settle the case for the policy limits of $100,000 in exchange for Turner's release from liability on the wrongful death claim. In the letter, Plowman reminded Aetna of her underinsured motorist claim against Aetna that was pending on appeal. Plowman stated in the letter that Aetna's refusal to agree to the settlement would operate as a waiver of Aetna's *Page 239 
right to subrogation from Turner. Plowman telephoned Aetna concerning the proposed settlement.
On January 7, 1993, Aetna responded as follows: "Aetna takes the position that it has no coverage, as confirmed by Judge Harwood in his order granting summary judgment to Aetna. Aetna therefore takes no position one way or the other as to [Plowman]'s settlement with State Farm." (C.R. 71).
On January 19, 1993, Plowman wrote another letter to Aetna, again stating that she intended to settle with Turner for the limits of the policy and to release Turner from liability. Plowman asked that Aetna notify her if Aetna's position had changed since the January 7, 1993, letter. Aetna did not respond.
Plowman and Turner settled their respective claims on February 5, 1993. Included in the settlement agreement was a provision for Plowman's right to proceed against Aetna for underinsured motorist benefits.
On June 30, 1993, this Court reversed the summary judgment entered in favor of Aetna and against Plowman, remanding the cause for further proceedings. Plowman v. Aetna Casualty Surety Co., 623 So.2d 1103 (Ala. 1993). On remand, the trial court ordered a trial of Plowman's underinsured motorist claim against Aetna and Aetna's cross-claim against Turner.
Turner amended his answer to Aetna's cross-claim to include the affirmative defenses of release, estoppel, and waiver. Turner then filed a motion for summary judgment on the cross-claim, arguing, among other things, that Aetna had destroyed any right of subrogation by allowing Plowman to release Turner from liability under the settlement. The trial court entered a summary judgment in favor of Turner. Aetna appeals.
Aetna argues that it is entitled to subrogation for underinsured motorist benefits paid pursuant to a wrongful death claim. Aetna also argues that it did not waive its right to subrogation by allowing Plowman to settle with Turner, and it argues that it complied with the requirements of Lambert v.State Farm Mut. Auto Ins. Co., 576 So.2d 160 (Ala. 1991), for preserving its subrogation rights.
 I. Is Aetna entitled to subrogation rights arising fromunderinsured motorist benefits paid pursuant to the wrongfuldeath claim of its insured?
We recognize that the legislative purpose in enacting statutes providing for underinsured motorist coverage was to protect those financially and ethically responsible enough to obtain automobile liability insurance by providing insurance to compensate them for claims based on injuries or death caused by those not so responsible. State Farm Mut. Auto. Ins. Co. v.Baldwin, 764 F.2d 773 (11th Cir. 1985).
Subrogation is based on two equitable principles: (1) that the insured should not recover twice for a single injury, and (2) that the insurer should be reimbursed for payments it made that, in fairness, should be borne by the wrongdoer. StarFreight, Inc. v. Sheffield, 587 So.2d 946 (Ala. 1991).
Although the Uninsured Motorist Act, § 32-7-1 et seq., Ala. Code 1975, does not expressly provide for subrogation, this Court has recognized that a right of subrogation exists in uninsured/underinsured motorist insurance cases. Star Freight, 587 So.2d at 955, citing Hardy v. Progressive Ins. Co.,531 So.2d 885 (Ala. 1988) (summary judgment for the insurer reversed because the record failed to support the judgment). In Hardy, this Court held that the insurer was entitled to subrogation for uninsured/underinsured motorist benefits paid by the insurer, pursuant to a personal injury claim, that exceeded the tortfeasor's liability.
This Court has not squarely addressed the issue of subrogation for underinsured motorist benefits paid pursuant to a wrongful death claim. The Uninsured Motorist Act does provide for the recovery of damages for an insured person who is injured or killed by an uninsured or underinsured motorist. We find no reason not to extend the right of subrogation to wrongful death claims on the same basis as this Court has allowed subrogation for claims involving *Page 240 
a personal injury. In light of the principles behind subrogation, we hold that an insurer that pays underinsured motorist benefits to a party pursuant to a wrongful death claim is entitled to subrogation from the wrongdoer.
Notably, in Progressive Specialty Ins. Co. v. Hammonds,551 So.2d 333 (Ala. 1989), the Court did not discuss whether there is a right to subrogation for underinsured motorist benefits paid pursuant to a wrongful death claim. Rather, the Court apparently assumed that the right to subrogation existed in that wrongful death case, but held that the insurance company failed to preserve its rights to pursue subrogation from the wrongdoer.
 II. Did Aetna waive or fail to preserve its right to subrogation?
This Court has established guidelines for preserving subrogation rights in regard to an uninsured/underinsured motorist claim. In Lambert v. State Farm Mut. Auto. Ins. Co.,576 So.2d 160 (Ala. 1991), we discussed the right of an insured to settle with a tort-feasor, and give the tort-feasor a complete release from liability, without getting consent to the settlement from the insured's carrier of underinsured motorist coverage. The competing principles in that case were the insured's right to settle and the insurer's right to subrogation.
The Court set out the following general rules for protecting the rights of the insured and the carriers of underinsured motorist coverage:
 "(1) The insured, or the insured's counsel, should give notice to the underinsured motorist carrier of the claim under the policy for underinsurance benefits as soon as it appears that the insured's damages may exceed the tort-feasor's limits of liability coverage.
 "(2) If the tort-feasor's liability insurance carrier and the insured enter into negotiations that ultimately lead to a proposed compromise or settlement of the insured's claims against the tort-feasor, and if the settlement would release the tort-feasor from all liability, then the insured, before agreeing to the settlement, should immediately notify the underinsured motorist insurance carrier of the proposed settlement and the terms of any proposed release.
 "(3) At the time the insured informs the underinsured motorist insurance carrier of the tort-feasor's intent to settle, the insured should also inform the carrier as to whether the insured will seek underinsured motorist benefits in addition to the benefits payable under the settlement proposal, so that the carrier can determine whether it will refuse to consent to the settlement, will waive its right of subrogation against the tort-feasor, or will deny any obligation to pay underinsured motorist benefits. If the insured gives the underinsured motorist insurance carrier notice of the claim for underinsured motorist benefits, as may be provided for in the policy, the carrier should immediately begin investigating the claim, should conclude such investigation within a reasonable time, and should notify its insured of the action it proposes with regard to the claim for underinsured motorist benefits.
 "(4) The insured should not settle with the tort-feasor without first allowing the underinsured motorist insurance carrier a reasonable time within which to investigate the insured's claim and to notify its insured of its proposed action.
 "(5) If the uninsured motorist insurance carrier refuses to consent to a settlement by its insured with the tort-feasor, or if the carrier denies the claim of its insured without a good faith investigation into its merits, or if the carrier does not conduct its investigation in a reasonable time, the carrier would, by any of those actions, waive any right to the subrogation against the tort-feasor or the tort-feasor's insurer.
 "(6) If the underinsured motorist insurance carrier wants to protect its subrogation rights, it must, within a reasonable time, and, in any event before the tort-feasor is released by the carrier's insured, advance to its insured an amount equal to the tort-feasor's settlement offer."
Lambert, 576 So.2d at 167.
The Court noted in Lambert that the procedure set forth there should take into consideration *Page 241 
the facts and circumstances of each case. We now apply these guidelines to the facts of this case. As to the first step, Plowman notified Aetna that her claim would exceed the tort-feasor's liability, when she sued Aetna in October 1990 for underinsured motorist benefits. At that time, Aetna began investigating Plowman's claim for the benefits. Plowman complied with step two when she notified Aetna by letter of the proposed settlement with Turner. Plowman also notified Aetna that she intended to pursue a claim for underinsured motorist benefits; thus, she complied with step three. Aetna, based on Plowman's letter, stated that it took no position on Plowman's proposed settlement with Turner, believing it had no obligation to pay benefits to Plowman. Aetna's denial of an obligation to pay benefits is an option under step three. We see nothing in the record to indicate that Aetna's belief that it did not owe Plowman any benefits was based on anything other than good faith, and this conclusion is supported by the trial judge's summary judgment in favor of Aetna.
Aetna had notice of the claim for underinsured motorist benefits in October 1990, and it began its investigation then. Approximately two years later, Plowman notified Aetna of her intent to settle with Turner. Certainly this was more than a reasonable period within which Aetna could investigate Plowman's claim; thus step four is satisfied.
Step five provides that a carrier of underinsured motorist coverage may waive its right of subrogation if it refuses to consent to the settlement or denies the claim without a good faith investigation into its basis or if it does not timely conduct an investigation. In this case, Aetna conducted an investigation into the claim. Believing that it did not owe Plowman any benefits, Aetna moved for a summary judgment. The trial judge agreed with Aetna's contention that it was not obligated to pay Plowman the benefits. This Court's reversal of the summary judgment does not mean that Aetna lacked a good faith basis for believing that it owed no benefits to Plowman. Therefore, Aetna did nothing to waive its right to subrogation.
The sixth step requires the carrier of underinsured motorist coverage to provide the insured with an amount equal to the settlement offer before the release of the tort-feasor, if it wants to preserve its subrogation rights. However, in this case, it would serve no purpose to require that Aetna had paid the settlement amount to its insured (Plowman) before the release of the tort-feasor (Turner), because Aetna, having received the summary judgment, was no longer in the case. When Plowman began her settlement negotiations with Turner, the trial court had determined that Plowman was not entitled to benefits under the policy with Aetna. This Court did not reverse the summary judgment entered in favor of Aetna untilafter Turner had been released. We find no reason why Aetna should have paid Plowman an amount equal to the settlement offered by Turner in order to preserve its subrogation rights, under the facts of this case.
Based on the foregoing, we conclude that Aetna did not waive its rights to subrogation from Turner.
REVERSED AND REMANDED.
MADDOX, SHORES, HOUSTON, INGRAM, COOK, and BUTTS, JJ., concur.